# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 17-20599

United States Court of Appeals
Fifth Circuit

**FILED**
July 16, 2019

Lyle W. Cayce
Clerk

APACHE DEEPWATER, L.L.C.,

> Plaintiff - Appellee

v.

W&T OFFSHORE, INCORPORATED,

> Defendant - Appellant

_____

Appeal from the United States District Court
for the Southern District of Texas

_____

Before HIGGINBOTHAM, GRAVES, and WILLETT, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

This dispute arises from a successful plugging and abandonment operation of three offshore oil and gas wells in the Mississippi Canyon area of the Gulf of Mexico. Apache Deepwater, LLC performed the operation and seeks payment from its non-operator partner, W&T Offshore, Inc. A jury awarded $43.2 million to Apache for W&T's breach of the Joint Operating Agreement. W&T challenges the district court's application of the Louisiana Civil Code and interpretation of the contract. Alternatively, W&T contends that it is entitled to an offset in damages because of Apache's bad faith. Finding no error, we affirm.

No. 17-20599

I.

In May 1999, Apache and W&T's predecessors entered into a Joint Operating Agreement ("JOA") that governed the operation of three offshore deepwater oil and gas wells (the "Wells") in the Mississippi Canyon area of the Gulf of Mexico. This dispute arises from operator Apache's plugging and abandonment ("P&A") of the Wells.

In 2012, Apache attempted to P&A the Wells with an intervention vessel called *Uncle John* with the consent of W&T, but that operation was unsuccessful. Following that failure, Apache contracted to use a different intervention vessel, the *Helix-534* ("*Helix*"). An internal figure by Apache estimated that the cost to P&A the Wells with the *Helix* was approximately $56,350,000. In June 2014, W&T contacted Apache to set up a status conference in July discussing the P&A operation, confirming that W&T knew "that the *Helix 534* is contracted for the project." At that meeting, W&T learned that Apache proposed using two drilling rigs for the project instead of the *Helix*, the *Ocean Onyx* ("*Onyx*") and *Ensco-8505* ("*Ensco*").

W&T and Apache offered to the jury competing explanations for the switch from the *Helix* to the *Onyx* and *Ensco* drilling rigs. By W&T's telling, Apache's decision to use the *Onyx* and *Ensco* was a simple matter of cost: W&T contends that Apache entered into a contract for the two drilling rigs for the purpose of drilling new deepwater wells, but abandoned that project in 2014 and was left with exorbitant stacking costs for the idle rigs (approximately $1,000,000 per day). W&T asserts that Apache's decision to use the rigs instead of the *Helix* was an attempt to recoup on the costs of contracting for the unused rigs because Apache had been unsuccessful in unloading the rigs onto another operator. Prior to the July meeting, Apache prepared estimates for the use of the rigs which totaled between $81 and $104 million. W&T points to an internal presentation in which Apache was weighing the costs of using the

2

*Helix* against the rigs and determining that with the stacking costs Apache was paying for the idle rigs, the use of the rigs would be cheaper because the cost would be split with W&T. Apache cancelled the *Helix* contract. W&T claims that although Apache purported to rely on written evaluations explaining the technical reasons the rigs were necessary (including that the *Helix* no longer complied with government regulations), Apache refused to provide those analyses to W&T.

Apache rejects W&T's economic explanation and argues that the *Helix* was not a safe option after the *Deepwater Horizon* spill and the government regulators would not have approved the *Helix* for the P&A operations. Apache put on evidence that it had discussed the risks of using the *Helix* with W&T, and demonstrated that technical difficulties posed by the Wells would make the "open water" operations of the *Helix* environmentally risky, that the Wells were "high risk," and that the drilling rigs were able to conduct the P&A operations with safeguards mitigating the risk of oil spills. Apache also claimed that the federal Bureau of Safety and Environmental Enforcement ("BSEE") advised Apache that it was no longer approving the type of open-water operations that *Helix* would need to perform to complete the P&A task. In Apache's version, W&T began "actively resisting" the P&A plan using the rigs because the *Helix* operation would be far cheaper for W&T and W&T was disregarding the environmental risk.[1] Apache argued to the jury that W&T ignored the fact that *Helix* would have had operational issues that would have

---

[1] Apache points to an internal e-mail from W&T's vice president Cliff Williams in which he wrote: "I'd like to determine options should we not agree with operators plan and believe we can perform well abandonments cheaper. Can we non-consent and take over abandonment operations with Apache obligated to pay their share of estimated abandonment costs?"

3

increased the costs of the operation past the initial estimates and that the use of the rigs was "reasonably necessary."

Amid their dispute over the appropriate intervention vessel, Apache sought W&T's approval for use of the rigs through an Authorizations for Expenditure ("AFE"), but W&T decided not to approve the use of the rigs,[2] and rejected two other requests for AFEs. Apache decided to use the rigs for the P&A and the work was successfully completed in February 2015 for a total cost of $139,900,000. Apache billed W&T for its contractual 49% share, or $68,570,000. W&T decided to pay $24,860,640, which represented 49% of the estimate for use of the *Helix*, contending that "Apache's insistence on using a drilling rig unnecessarily and unreasonably increased the costs of this work," and determining that it was not obligated to pay the full billed amount because it had not approved the AFEs.

Apache sued for breach of contract in Texas state court in December 2014 and the case was removed by W&T in January 2015. Prior to trial, W&T moved for summary judgment on Apache's breach of contract claim, arguing that the JOA was unambiguous in requiring the operator (Apache) to obtain an approved AFE before expending over $200,000. The parties' argument turned on the reading of two provisions in the JOA: § 6.2 governing authorizations for expenditures and § 18.4 governing abandonment operations required by the government:

> **6.2. Authorization for Expenditure:** The Operator shall not make any single expenditure or undertake any activity or

---

[2] In its response, W&T stated: "We believe Apache, as a prudent operator, has an obligation to conduct the operation in a cost effective and safe manner in compliance with all governmental regulations. We do not understand why Apache continues to advocate the use of the Ensco 8505 rig when it is clear that an intervention vessel could safely perform the abandonment work at a much lower cost. . . . We do not believe W&T should be obligated to pay the additional charges arising from the use of the Ensco rig when other less expensive options are available."

operation costing Two Hundred Thousand Dollars ($200,000) or more, unless an AFE has either (1) been included in a proposal for an activity or operation and is approved by the Participating Parties through their Election to participate in the activity or operation, or (2) received the approval of the Parties as a General Matter. When executed by a party, an AFE grants the Operator the authority to commit or expend funds on the activity or operation in accordance with this Agreement for the account of the Participating Parties. . . .

**18.4. Abandonment Operations Requirement by Governmental Authority:** The Operator shall conduct the abandonment and removal of any well, Production System or Facilities required by a governmental authority, and the Costs, risks and net proceeds will be shared by the Participating Parties in such well, Production System or Facilities according to their Participating Interest Share.

The district court denied W&T's motion for summary judgment and determined that the interaction of the provisions in the JOA was ambiguous, creating an issue of fact as to the "parties' intent on the applicability of § 6.2 to a government-mandated plugging and abandonment operation governed by § 18.4." The case proceeded to trial and the jury made five findings:

(1) Did W&T fail to comply with the Contract by failing to pay its proportionate share of the costs to plug and abandon the MC 674 wells? **Yes.**

(2) What sum of money, if any, would compensate Apache for W&T's failure to pay its proportionate share of costs to plug and abandon the MC 674 wells? **$43,214,515.83.**

(3) Was Apache required to obtain W&T's approval under Section 6.2 of the Contract before Apache plugged and abandoned the MC 674 wells as required under Section 18.4 of the Contract? **No.**

No. 17-20599

(4) Did Apache act in bad faith, thereby causing W&T to not comply with the contract? **Yes.**

(5) By what amount, if any, should the amount you found in response to Jury Question No. 2 be offset? **$17,000,000.**

Following trial, the court entered its order and final judgment, determining that the jury's "bad faith" finding in Question 4 did not preclude Apache's recovery for breach of contract under Louisiana law and holding that W&T was not entitled to an offset under Louisiana law. The district court also denied W&T's motion for a new trial or remittitur and renewed motion for judgment as a matter of law. This appeal followed.

## II.

This court reviews the denial of a Rule 50(b) renewed motion for judgment as a matter of law *de novo*, "but our standard of review with respect to a jury verdict is especially deferential."[3] A party is only entitled to judgment as a matter of law on an issue where no reasonable jury would have had a legally sufficient evidentiary basis to find otherwise.[4] In evaluating the evidence, this court "credit[s] the non-moving party's evidence and disregard[s] all evidence favorable to the moving party that the jury is not required to believe."[5] This court also has jurisdiction "to hear an appeal of the district court's legal conclusions in denying summary judgment, but only if it is sufficiently preserved in a Rule 50 motion."[6]

"A district court's resolution of a motion for new trial is reviewed for abuse of discretion, and '[t]he district court abuses its discretion by denying a

---

[3] *Olibas v. Barclay*, 838 F.3d 442, 448 (5th Cir. 2016) (quoting *Evans v. Ford Motor Co.*, 484 F.3d 329, 334 (5th Cir. 2007)) (internal quotation marks omitted).

[4] FED. R. CIV. P. 50(a)(1).

[5] *Janvey v. Romero*, 817 F.3d 184, 187 (5th Cir. 2016) (quoting *Abraham v. Alpha Chi Omega*, 708 F.3d 614, 620 (5th Cir. 2013)) (internal quotation marks omitted).

[6] *Feld Motor Sports, Inc. v. Traxxas, L.P.*, 861 F.3d 591, 596 (5th Cir. 2017).

No. 17-20599

new trial only when there is an "absolute absence of evidence to support the jury's verdict.""[7] "A motion for a new trial or to amend a judgment cannot be used to raise arguments which could, and should, have been made before the judgment issued."[8] "To the extent that a Rule 59(e) ruling was a reconsideration of a question of law, . . . the standard of review is *de novo*."[9]

## III.

W&T contends that the plain language of Louisiana Civil Code Article 2003 dictates that the jury's bad faith finding bars Apache's recovery for breach of contract. Article 2003 states that

> An obligee may not recover damages when his own bad faith has caused the obligor's failure to perform or when, at the time of the contract, he has concealed from the obligor facts that he knew or should have known would cause a failure.
>
> If the obligee's negligence contributes to the obligor's failure to perform, the damages are reduced in proportion to that negligence.[10]

In answering the fourth question on the verdict form, the jury found that "Apache act[ed] in bad faith thereby causing W&T to not comply with the contract."

The district court denied W&T's motion for judgment as a matter of law, concluding that it was bound by the Louisiana Supreme Court's decision in

---

[7] *McCaig v. Wells Fargo Bank (Tex.), N.A.*, 788 F.3d 463, 472 (5th Cir. 2015) (quoting *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 881 (5th Cir. 2013)).

[8] *Garriot v. NCsoft Corp.*, 661 F.3d 243, 248 (5th Cir. 2011) (citation omitted) (internal quotation marks omitted).

[9] *Hoffman v. L&M Arts*, 838 F.3d 568, 581 (5th Cir. 2016) (internal quotation marks, citations, and alterations omitted). The parties dispute whether the district court's denial of W&T's Rule 59 motion involved a pure question of law, with W&T arguing that it did and Apache suggesting that W&T's motion merely criticized the evidence presented at trial. The Rule 59 motion and district court's ruling is discussed below in Section III.

[10] La. Civ. Code art. 2003.

*Lamar Contractors, Inc. v. Kacco, Inc.*[11] The district court determined that, under *Lamar*, Article 2003's bad faith damages bar is only implicated where the obligor has established that the obligee failed to perform a contractual obligation that caused the obligor's failure to perform. In other words, to avoid liability pursuant to Article 2003's bad faith bar, W&T would have to show that Apache failed in its performance of the contract and that failure caused W&T's breach. Because the jury did not find that Apache had breached any obligation under the contract,[12] the district court reasoned that it was required to set aside the jury's finding on Question 4—that Apache's bad faith caused W&T's failure to perform—meaning Apache was not barred from recovery under Article 2003.

W&T disputes the district court's reading of and reliance on *Lamar*, arguing that (1) *Lamar* is not binding on this court because it is not *jurisprudence constante* and this court must instead follow the plain language of Article 2003, which contains no language limiting Article 2003's application to situations where the obligee has breached; (2) *Lamar*'s holding is limited to Article 2003's negligence clause; and (3) application of *Lamar* is contrary to public policy.

In diversity cases where this court must apply Louisiana substantive law,[13] "we look to the final decisions of the Louisiana Supreme Court."[14] In the absence of a final decision by the state's supreme court, we make an *Erie* guess, which requires us to "employ Louisiana's civilian methodology, whereby we

---

[11] 189 So. 3d 394 (La. 2016).

[12] The district court noted that the jury considered and rejected that Apache had breached. For example, had the jury answered Question 3 in the affirmative, that would have amounted to a finding that Apache had breached an obligation under the contract. Question 3 asked whether Apache was required to obtain W&T's approval under § 6.2 before completing the P&A as required by § 18.4, which the jury answered in the negative.

[13] *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938).

[14] *In re Katrina Canal Breaches Litig.*, 495 F.3d 191, 206 (5th Cir. 2007).

first examine primary sources of law: the constitution, codes, and statutes."[15] Even caselaw rising to the level of *jurisprudence constante* is "secondary law in Louisiana"[16] and, accordingly, we are not strictly bound by the decisions of Louisiana's intermediate appellate courts.[17] So, it is only when the Louisiana Supreme Court has not made a determinative decision that this court must make an *Erie* guess, employing Louisiana's civilian methodology.[18]

The parties dispute whether *Lamar* speaks definitively on the issue of whether Article 2003 bars recovery of damages only when the obligee has been found in breach. In *Lamar,* the Louisiana Supreme Court considered a trial court's decision to reduce breach of contract damages awarded to a general contractor, Lamar, after finding that Lamar had contributed to the subcontractor's failure to perform.[19] The obligation imposed by Article 2003 is "correlative to the general duty imposed by [Article] 1983, which requires 'contracts must be performed in good faith.'"[20] However, the court warned that the duty of good faith is not to be considered in isolation, and that it is circumscribed by the obligations imposed by the contract.[21] The court noted that "[a]lthough we have not had occasion to consider [Article] 2003 since its

---

[15] *Id.* at 206 (quoting *Am Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003)).

[16] *Prytania Park Hotel, Ltd. v. Gen. Star Indem. Co.*, 179 F.3d 169 (5th Cir. 1999).

[17] *In re Katrina*, 495 F.3d at 206 ("Thus, although we will not disregard the decisions of Louisiana's intermediate courts unless we are convinced that the Louisiana Supreme Court would decide otherwise, we are not strictly bound by them.") (citing *Am Int'l Specialty Lines*, 352 F.3d at 261).

[18] *Boyett v. Redland Ins. Co.*, 741 F.3d 604, 607 (5th Cir. 2014); *see also Moore v. State Farm Fire & Cas. Co.*, 556 F.3d 264, 269–70 (5th Cir. 2009) ("To determine Louisiana law, we look to the final decisions of the Louisiana Supreme Court. In the absence of a final decision by the Louisiana Supreme Court, we must make an *Erie* guess . . . . When faced with unsettled questions of Louisiana law we adhere to Louisiana's civilian decision-making process.").

[19] *Lamar*, 189 So. 3d at 395–97.

[20] *Id.* (citing La. Civ. Code art. 1983) (internal alteration omitted).

[21] *Id.* at 398.

enactment in 1985, jurisprudence interpreting the predecessor article . . . emphasized that the obligor must establish that the obligee breached the contract, thereby making it more difficult for the obligor to perform its obligation."[22] It concluded: "[A]n obligor cannot establish an obligee has contributed to the obligor's failure to perform unless the obligor can prove the obligee itself failed to perform duties owed under the contract. Stated in other words, Kacco must demonstrate that Lamar failed to perform its obligations under the contract, which in turn contributed to Kacco's breach of the contract."[23] The question of the obligee's bad faith does not become relevant until there is a determination that the obligee failed to perform a contractual obligation that in turn caused the obligor's failure to perform.[24] For Article 2003 to apply as a damages bar, there must be an antecedent determination of breach.

While W&T urges that the Louisiana Supreme Court's reading was limited to the second sentence of Article 2003—the negligence prong—the *Lamar* court drew no such limitation.[25] The reasoning of *Lamar* did not depend on the relationship between bad faith and negligence. W&T offers no principled reason why the Louisiana Supreme Court would have chosen not to recognize a requirement of breach had the obligee in that case acted in bad faith, rather than negligently. Indeed, we find no distinction in *Lamar*. Because *Lamar* is controlling here, the district court correctly concluded that the good-faith inquiry in Article 2003 is limited to situations where the obligee has

---

[22] *Id.* (referring to its decisions in *Board of Levee Com'rs of Orleans Levee Dist. v. Hulse*, 120 So. 589, 590 (La. 1929) and *Favrot v. Favrot*, 68 So. 3d 1099, 1109 (La. Ct. App. 2011)).

[23] *Id.*

[24] *Id.* at 399 (summarizing the intermediate appellate court's conclusion in *Favrot* that "the question of a party's good or bad faith does not become relevant until there has been a determination that the party failed to perform an obligation under the contract").

[25] *Id.*

No. 17-20599

breached.[26] The jury did not find that Apache breached so Article 2003 does not bar Apache's entitlement to damages as a matter of law.

IV.

W&T also contends that the case never should have gone before a jury because W&T did not breach the contract as a matter of law. Section 6.2 of the JOA provides that the operator "shall not make any single expenditure or undertake any activity or operation costing Two Hundred Thousand Dollars ($200,000 or more), unless an AFE [is approved]." W&T reads that provision in conjunction with Exhibit C, governing accounting, which provides that "[a]cceptable reasons for non-payment or short payment . . . are as follows: . . . when an AFE is not approved." Together, W&T argues, those provisions unambiguously resolve the issue of whether W&T breached. Because W&T as the non-operator decided not to approve any AFE, it contends that it was entitled to short the payment (and pay its share of the *Helix* P&A estimate) without being found in breach of the JOA. W&T emphasizes that Section 6.2 does not contain an explicit exception for government-mandated operations undertaken pursuant to Section 18.4 and suggests that AFE approval was required even for operations performed under that Section. W&T points out that the parties understood how to make an exception to Section 6.2 and did so in a separate instance, exempting the operator from obtaining AFE approval in the event of a safety-threatening emergency.[27]

---

[26] W&T suggests as a last resort that this court may certify the question to the Louisiana Supreme Court. Because we conclude that the Louisiana Supreme Court resolved this issue in *Lamar*, certification is unnecessary here. *Cf. Janvey v. Golf Channel, Inc.*, 792 F.3d 539, 547 (5th Cir. 2015) ("Given . . . that this is a question of state law that no on-point precedent from the Supreme Court of Texas has resolved, that the Supreme Court of Texas is the final arbiter of Texas's law . . . we believe it is best to certify the question at issue.").

[27] "Notwithstanding the foregoing, in the event of an emergency which poses a threat to life, safety, property, or the environment, the Operator is empowered to immediately make such expenditures for the Joint Account as, in its opinion as a reasonable and prudent Operator, are necessary to deal with the emergency."

11

No. 17-20599

Apache disputes W&T's reading of the contract, arguing that under Section 18.4, which covers government-mandated P&A operations, Apache was required to undertake its P&A of the Wells as the operator and was authorized to do so without obtaining an AFE from W&T pursuant to Section 6.2. Section 18.4 provides that

> The Operator shall conduct the abandonment and removal of any well, Production System or Facilities required by a governmental authority, and the Costs, risks and net proceeds will be shared by the Participating Parties in such well, Production System or Facilities according to their Participating Interest Share.

Apache asserts that this provision contemplates cost-sharing between the parties and does not incorporate Section 6.2's AFE process. Apache stresses that requiring a Section 6.2 AFE for a government-mandated P&A operation would lead to an absurd result because the non-operator could essentially hold-up an operator from completing a P&A required by federal law to avoid sharing the costs.

The district court denied W&T's motion for summary judgment, concluding that the interplay between Section 6.2 and Section 18.4 was ambiguous, leaving a material question of fact as to the parties' intent. In answering Question Three, the jury found that Apache was not required to obtain W&T's approval through an AFE before conducting the P&A as required by Section 18.4[28]

Whether contract language is ambiguous under Louisiana law is a question of law.[29] Under Louisiana law, "[w]hen the words of a contract are clear and explicit and lead to no absurd consequences, no further

---

[28] "Was Apache required to obtain W&T's approval under Section 6.2 of the Contract before Apache plugged and abandoned the MC-674 wells as required under Section 18.4 of the Contract?"

[29] *Cadwallader v. Allstate Ins. Co.*, 848 So. 2d 577, 580 (La. 2003).

interpretation may be made in search of the parties' intent."[30] "[I]f a court finds the contract to be unambiguous, it may construe the intent from the face of the document—without considering extrinsic evidence—and enter judgment as a matter of law."[31] If the court determines that there is an ambiguity, the question of intent is an issue of fact.[32] "Louisiana courts will not interpret a contract in a way that leads to unreasonable consequences or inequitable or absurd results even when the words used in the contract are fairly explicit."[33]

Applying Section 6.2's expenditure provision to a government-mandated P&A undertaken pursuant to Section 18.4 would lead to an absurd consequence: namely a situation where a non-operator is empowered to hold an operator hostage, preventing the operator from completing a legally required P&A, in order to extract a better bargain or avoid cost-sharing altogether. The oddity of that result is compounded by the fact that Section 18.4 has its own cost-sharing provision,[34] making the idea that the operator was required to obtain an AFE to complete the P&A less tenable. In light of that absurd consequence, the district court correctly concluded that the jury needed to resolve the question of the parties' intent.[35] We agree therefore that

---

[30] La. Civ. Code art. 2046.

[31] *Preston Law Firm, L.L.C. v. Mariner Health Care Mgmt Co.*, 622 F.3d 384, 392 (5th Cir. 2010) (internal citation omitted).

[32] *Gebreyesus v. F.C. Schaffer & Assocs., Inc.*, 204 F.3d 639, 643 (5th Cir. 2000).

[33] *Tex. E. Transmission Corp. v. Amerada Hess Corp.,* 145 F.3d 737, 742 (5th Cir. 1998); *see also* La. Civ. Code art. 2046 ("When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent.").

[34] "The Operator shall conduct the abandonment and removal of any well, Production System or Facilities required by a governmental authority, and the *Costs, risks and net proceeds will be shared* by the Participating Parties in such well, Production System or Facilities according to their Participating Interest Share."

[35] La. Civ. Code art. 2046 ("When the words of a contract are clear and explicit and lead to no absurd consequences, no further interpretation may be made in search of the parties' intent."); *Stewart Enters., Inc. v. RSUI Indem. Co., Inc.*, 614 F.3d 117 (5th Cir. 2010) (holding that the most straightforward reading of the contract would lead to an absurd result that "could not have been intended by the parties").

No. 17-20599

the question of whether Section 6.2's expenditure requirement applies to government-mandated P&A undertaken pursuant to Section 18.4—which itself mandates cost-sharing—is ambiguous and was properly put to the jury.

W&T's response to the absurdity concern is unavailing. It suggests that if the parties fail to agree on costs through the AFE process, the government can simply conduct the P&A operation itself and charge the operator and non-operator later.[36] W&T does not dispute that federal law required the P&A operation of the Wells—rather it reads the Section 6.2 AFE requirement to apply to government-mandated P&A operations and urges that Apache, having failed to obtain an AFE from W&T, could have decided not to comply with federal regulations and allow the government to P&A the Wells itself. Allowing Apache to evade its obligations under federal law to P&A the Wells is contrary to its duty to conduct all operations as would a prudent operator.[37] W&T's proposed answer to the troubling consequences of its reading is no solution at all.

V.

Finally, W&T claims that even if Apache was not barred from recovering damages, W&T is entitled to an offset based on Jury Question No. 5 and that the damages award of $43,214,515.83 should be reduced by $17 million. As to the legal basis for the offset, W&T points to "the basic law of damages" in Louisiana set out in La. Civ. Code art. 1995 that damages cannot place the obligee in a better position than it would have been in if the contract had been fulfilled. W&T posits that the jury determined that a $17 million offset was

---

[36] "If parties cannot agree about costs and thus fail to P&A wells, the government can arrange for the P&A, deem the bond the working interest owners were required to provide forfeited to the amount that would cover P&A costs, and charge the working interest owners for any excess costs."

[37] "The Operator shall conduct all operations in a good and workmanlike manner, as would a prudent operator under the same or similar circumstances."

14

appropriate to account for the savings that Apache enjoyed by not incurring the stacking costs for the rigs. In its view, the jury credited testimony that Apache would have incurred stacking costs between $29.5 million and $36.4 million and adopted the $17 million figure as a reasonable determination of Apache's windfall. The district court denied W&T's motion for entry of judgment and motion for a new trial, concluding that W&T was not entitled to an offset on the basis of Question 5. Specifically, the district court determined that Questions 2 and 5 were *not* linked, and offset was unavailable as an affirmative defense under any of W&T's theories.

Article 1995 provides that "[d]amages are measured by the loss sustained by the obligee and the profit of which he has been deprived."[38] "The measure of damages for a breach of contract is the sum that will place plaintiff in the same position as if the obligation had been fulfilled."[39] On Question 2, the jury was instructed in accordance with Article 1995 to calculate "an amount that is fair compensation for those damages." The court then explained to the jury:

> Damages are measured by the loss sustained by the non-breaching party. These are called compensatory damages. The damages amount is the amount that will place Apache in the position it would have been in if the parties' contract had been properly performed. The damages include the amount a party owed under the contract.

The jury was instructed to determine the actual loss sustained without reference to Question 5. W&T's own closing argument emphasized this understanding, encouraging the jury in calculating an amount for Question 2 to subtract the amount of savings W&T attributed to Apache's avoiding the

---

[38] La. Civ. Code art. 1995.

[39] *Gloria's Ranch LLC v. Tauren Exploration, Inc.*, 252 So. 3d 431, 445–46 (La. 2018) (internal citation and quotation marks omitted).

stacking costs by using the rigs.[40] W&T's offset argument on appeal ignores the fact that the jury instructions with respect to Question 2 tracked the language of Article 1995. The two cases W&T relies on do not offer a theory entitling W&T to offset. In *Evangeline Parish School Bd. v. Energy Contracting Servs., Inc.*, the Louisiana appellate court considered a damages award in favor of an obligee to an energy-savings services contract.[41] The court reaffirmed the general principle of Article 1995 that "[d]amages for obligor's failure to perform are measured by the loss sustained by the obligee and the profit of which he has been deprived" and remanded, noting that the experts failed to calculate the amount overcharged and the appellate court was therefore "unable to make such a determination from the record."[42] There is no lack of clarity in the record here—W&T simply disputes the jury's rejection of its stacking costs theory. In *Swoboda v. SMT Prop., LLC*, the Louisiana appellate court considered the damages award in a contract dispute involving the construction of a residential home.[43] In accordance with Article 1995, the court "consider[ed] the benefit to plaintiffs in maintaining ownership and possession of the adjacent lot [and] conclude[ed] that plaintiffs [we]re not entitled to reimbursement."[44] Again, W&T ignores that the jury was instructed in accordance with Article 1995 and explicitly calculated the actual loss sustained by Apache. W&T's stacking costs theory was rejected by the jury and it has offered no legal theory to support upsetting that verdict.

---

[40] "Number two is the damage issue. We believe that if you get to that issue, and you believe that somehow damages should be awarded in this case, they say it is 43.2 million. We think they benefited anywhere . . . between 29 to 36 million. So we believe you should subtract that from any damage amount you decide to award in the case."

[41] 617 So. 2d 1259 (La. App. 3d. 1993).

[42] *Id.* at 1267.

[43] 975 So. 2d 691 (La. App. 2008).

[44] *Id.* at 695.

W&T posits two additional legal bases to support an offset in Apache's damages award. First, W&T suggests that Article 2323, governing comparative fault, provides an independent legal basis for a reduction. Article 2323 applies in tort cases; the Civil Code provides its own rule governing comparative fault in contract cases—Article 2003—that we have already determined does not aid W&T here.[45] W&T also claims the doctrine of compensation under Article 1893 gives independent grounds for an offset.[46] As the district court correctly noted, W&T "previously admitted neither [compensation or unjust enrichment] could be the basis of the jury's finding, as that was not the nature of the evidence presented to the jury." In its post-verdict briefing, W&T conceded that Article 1893 did *not* apply, because "the jury was not instructed on the specific requirements of the traditional doctrine of offset or setoff, which requires debts owed by both parties being offset against each other." Neither comparative fault nor compensation provide a basis for a reduction in the damages award here.

Finally, W&T offers a last-ditch argument that the jury award was clearly excessive because of Apache's savings on the stacking costs. The district court did not abuse its discretion in denying W&T's motion for a new trial or remittitur. We agree with the district court the damages award was supported by substantial evidence. The jury logically awarded the precise amount that W&T shorted by making a partial payment after the P&A operation. Such an award was not excessive or "contrary to right reason"—rather, it reflects that

---

[45] *See Justiss Oil Co. v. Oil Country Tubular Corp.*, 216 So. 3d 346, 356–57 (La. Ct. App.), *writ denied*, 227 So. 3d 830 (La. 2017) (quoting *Hanover Ins. Co. v. Plaquemines Parish Gov't*, No. 12–1680, 2015 WL 4167745, at \*5–6 (E.D. La. July 9, 2015).

[46] Article 1893 provides that "Compensation takes place by operation of law when two persons owe to each other sums of money or quantities of fungible things identical in kind, and these sums or quantities are liquidated and presently due. In such a case, compensation extinguishes both obligations to the extent of the lesser amount." La. Civ. Code art. 1893.

No. 17-20599

the jury's consideration of the evidence led it to reject W&T's assertion that Apache enjoyed a windfall by avoiding the stacking costs.[47]

## VI.

For the foregoing reasons, the judgment of the district court is affirmed.

---

[47] *Laxton v. Gap, Inc.*, 333 F.3d 572, 586 (5th Cir. 2003) ("When a damage award is merely excessive or so large as to appear contrary to right reason, remittitur is the appropriate remedy.").