# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

October 14, 2025

Lyle W. Cayce
Clerk

No. 23-40342

Kimberly Harmon,

*Plaintiff—Appellee*,

*versus*

Bryan Collier, *Executive Director, Texas Department of Criminal Justice*; Texas Department of Criminal Justice

*Defendants—Appellants*.

―――――――――――――――――――――――――

Appeal from the United States District Court
for the Eastern District of Texas
USDC No. 1:20-CV-460

―――――――――――――――――――――――――

Before Dennis, Southwick, and Ho, *Circuit Judges*.

Leslie H. Southwick, *Circuit Judge*:

A state correctional officer sued her employer alleging disability discrimination in violation of federal law. A jury found in her favor and awarded $1.8 million in damages. The district court later reduced the amount to $1 million. The Defendants raise numerous issues on appeal. Most turn on the credibility of witnesses, a matter generally beyond our authority to review. Nonetheless, we agree the monetary judgment cannot be upheld in full. We AFFIRM in part, REVERSE in part, VACATE, and REMAND.

No. 23-40342

## FACTUAL AND PROCEDURAL BACKGROUND

Kimberly Harmon was a correctional officer in the Texas Department of Criminal Justice ("TDCJ") for about 18 years. Harmon suffers from diabetes, hypertension, and chronic lower-back pain. Starting in 2009, Harmon was assigned to TDCJ's Gist Unit. The Gist Unit is a minimum-security facility in which correctional officers work eight-hour shifts, six days on and three days off. Officers are assigned one of three shifts: "first shift" is 6:30 a.m. to 2:30 p.m.; "second shift" is 2:30 p.m. to 10:30 p.m.; and "third shift" is 10:30 p.m. to 6:30 a.m. Second shift is less desirable because new officers are assigned to that shift and because the inmates' behavior is different during those hours. There is a waitlist to be assigned first shift, and Harmon waited three years until she was assigned that shift.

TDCJ allows its employees to take up to 180 days of leave without pay ("LWOP") on a 12-month rolling basis. LWOP may be taken intermittently or all at once, but requests for LWOP require approval from the employee's warden or department head. Scheduled days off while on LWOP count toward the 180-day limit. "If an employee is released to return to work by the 180 calendar day LWOP maximum date," but the date of release is during the employee's scheduled days off, "the employee shall be permitted to return to work on the first day of the employee's next work cycle." For correctional officers, a release to return to work must be unconditional.

While on leave in August 2017, Harmon received a call from Amy Foreman, a human resources ("HR") representative, informing her that she would be placed on second shift when she returned to work. The shift change was at the direction of the warden, Charles Siringi. Harmon was not given a reason for the change, so she called and wrote Siringi asking for a reason. She did not receive one. On September 1, Harmon inquired further by calling the

2

HR department, where she spoke with a "newer representative named Kelly." According to Harmon, Kelly said she was placed back on first shift. When Harmon returned to work on or around September 25, however, her supervisor stated she was on second shift, per HR's instructions. Harmon testified she was unable to return to work during second shift because her blood pressure was high after being "humiliated" in front of her coworkers. She then went to the doctor and notified TDCJ.

On September 28 or 29, Harmon filed an equal employment opportunity ("EEO") complaint against Warden Siringi. She also filed several internal grievances related to the incident. Her EEO complaint was investigated by John Werner, the regional director for Harmon's facility and Siringi's supervisor. Although his investigation "did not reveal that Ms. Harmon was singled out due to her medical conditions," Werner found "the situation could have been handled in a better manner." Harmon's grievance on this issue was marked "Sustained. Relief granted," and she was returned to first shift. At trial, Harmon testified that upon her return, Siringi yelled in her direction: "How you going to say that I violated the leave law?" Siringi denied this.

While Harmon was out on leave in mid-March 2018, she received a PERS 301 notice from TDCJ stating she had 80 days of LWOP remaining.[1] The notice Harmon received was prepared by Marisol Reyes, an HR representative. At trial, Reyes testified that the figure of 80 remaining LWOP days was a mistake; she did not inform Harmon that it was a mistake; and she was not aware there was a mistake at the time. After Harmon returned to work in March, she did not take additional leave until May 11.

_____

[1] This notice is supposed to be sent to TDCJ employees each time they take leave. The record contains all the PERS 301 notices prepared for Harmon between 2017 and 2018, though Harmon testified she did not receive most of them.

Reyes prepared another PERS 301 notice informing Harmon that she had 16 LWOP days remaining. Harmon disputes receiving it. At trial, Reyes could not confirm or explain how many LWOP days Harmon had remaining after her March absence or how many remained during her May absence. It remains unclear when, exactly, Harmon exhausted her LWOP.

According to Harmon, she was first informed that she was about to run out of LWOP when she received a voicemail from Reyes at 4:36 p.m. on May 30, informing Harmon that she must return to work the following day or she would be terminated for exhausting her LWOP. Harmon did not hear the voicemail until that weekend (June 2 or 3) because her phone was broken. On May 31, before Harmon heard the message, she went to her doctor, who told her she needed an additional day off. Her doctor faxed the note to TDCJ, and Reyes received it on the same day. The note stated Harmon was to return to work on June 4 "without restrictions."

Under the belief that Harmon exhausted her LWOP days, Reyes initiated Harmon's "administrative separation" from TDCJ on June 1. Reyes also left Harmon another voicemail instructing her not to return to work on June 4 and to wait until a final determination was made regarding her separation. At trial, Reyes testified that she did not forward Harmon's doctor's note to other officials because she was "not required to." Shannon Wood, TDCJ's Director of Employee Services, testified that Reyes's handling of Harmon's separation did not follow TDCJ policies.

After looking for another job and completing a six-month work program, Harmon reapplied to TDCJ in November 2019. In her application, she noted the reason for her 2018 termination was for "exhaustion of leave." On December 18, 2019, Vashunna Jefferson, an HR employee, recommended Harmon be rehired. On January 13, 2020, regional director Werner recommended against rehiring Harmon. On January 25, an

employee named Billy Hirsch decided Harmon would not be rehired. At trial, Werner could not recall why he recommended against Harmon's rehire and agreed that it was surprising TDCJ did not rehire her because of an ongoing correctional officer shortage.

In the meantime, Harmon filed an Equal Employment Opportunity Commission ("EEOC") complaint in July 2018. On January 30, 2020, the EEOC made an initial determination that Harmon's charges of disability discrimination and retaliation were supported by available evidence. EEOC issued a final decision finding the same on May 13, 2020. On August 31, 2020, Harmon received the Department of Justice's Dismissal and Notice of Right to Sue letter.

In November 2020, Harmon brought suit in the United States District Court for the Eastern District of Texas, alleging violations of the Americans with Disabilities Act ("ADA"). Her ADA claims were against Brian Collier, Executive Director of TDCJ, in his official capacity. Harmon requested "prospective injunctive relief . . . including an order of reinstatement to the position and benefits she would have held if she had not been terminated." She also alleged violations of Section 504 of the Rehabilitation Act of 1973 against TDCJ, requesting an award for "back pay, and lost benefits and seniority; and compensatory damages." Harmon requested attorney's fees and costs for both claims.

On April 4, 2022, a jury trial began on Harmon's claims. Three days later, the jury returned a verdict for Harmon on all counts. It awarded Harmon $800,000 for "[p]ast mental anguish, anxiety, and emotional distress" and $1 million for "[w]ages and benefits from May 31, 2018 to April 7, 2022." On March 23, 2023, the district court denied the Defendants' renewed motion for judgment as a matter of law but partially granted their alternative motion for entry of final judgment. The court withheld from final

judgment Harmon's emotional distress damages because the Supreme Court held those were not recoverable under the Rehabilitation Act. *See Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 230 (2022). The court entered final judgment against the Defendants for $1 million in damages and awarded attorney's fees and costs. In a separate order, the court denied the Defendants' motion for a new trial or to amend the judgment under Federal Rule of Civil Procedure 59. The Defendants timely appealed.

## DISCUSSION

We review the denial of a "motion for judgment as a matter of law *de novo*, 'but our standard of review with respect to a jury verdict is especially deferential.'" *Apache Deepwater, L.L.C. v. W&T Offshore, Inc.*, 930 F.3d 647, 652–53 (5th Cir. 2019) (quoting *Olibas v. Barclay*, 838 F.3d 442, 448 (5th Cir. 2016)). Judgment as a matter of law is appropriate if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). "In evaluating the evidence, this court 'credit[s] the non-moving party's evidence and disregard[s] all evidence favorable to the moving party that the jury is not required to believe.'" *Apache Deepwater*, 930 F.3d at 653 (alterations in original) (quoting *Janvey v. Romero*, 817 F.3d 184, 187 (5th Cir. 2016)). As a court of review, "we do not make credibility determinations or weigh the evidence." *Williams v. Manitowoc Cranes, LLC*, 898 F.3d 607, 614 (5th Cir. 2018) (quoting *Homoki v. Conversion Servs., Inc.*, 717 F.3d 388, 395 (5th Cir. 2013)). We may only reverse the denial of a motion for judgment as a matter of law "if the facts and inferences point so strongly and overwhelmingly in favor of the moving party that reasonable jurors could not have arrived at a contrary verdict." *Id.* (quoting *Homoki*, 717 F.3d at 395).

"We review the denial of a motion for a new trial for an abuse of discretion." *Id.* "The district court abuses its discretion by denying a new

trial only when there is an absolute absence of evidence to support the jury's verdict." *Id.* (quoting *OneBeacon Ins. Co. v. T. Wade Welch & Assocs.*, 841 F.3d 669, 676 (5th Cir. 2016)).

Denials of motions to alter or amend a judgment under Rule 59(e) are also reviewed for abuse of discretion. *Rollins v. Home Depot USA*, 8 F.4th 393, 396 (5th Cir. 2021). "A motion to alter or amend the judgment under Rule 59(e) must clearly establish either a manifest error of law or fact or must present newly discovered evidence and cannot be used to raise arguments which could, and should, have been made before the judgment issued." *In re Life Partners Holdings, Inc.*, 926 F.3d 103, 128 (5th Cir. 2019) (quoting *Schiller v. Physicians Res. Grp. Inc.*, 342 F.3d 563, 567 (5th Cir. 2003)). "To the extent that a Rule 59(e) ruling was a reconsideration of a question of law, . . . the standard of review is *de novo*." *Apache Deepwater*, 930 F.3d at 653 (quoting *Hoffman v. L & M Arts*, 838 F.3d 568, 581 (5th Cir. 2016)).

The Defendants raise the following issues on appeal: (1) sufficiency of the evidence on Harmon's discrimination and retaliation claims for her termination and failure to rehire; (2) irreconcilability of the answers in the jury's verdict; and (3) propriety of the money judgment in several respects. We separately address each issue, but we will start with the monetary judgment against Collier because it concerns the district court's jurisdiction. *See Doe v. United States*, 853 F.3d 792, 798 (5th Cir. 2017).

## I.    *Monetary judgment against Collier on ADA claims*

The Defendants argue that the district court erred in entering judgment against Collier because the only relief granted was monetary, and Collier is protected by sovereign immunity. Harmon's only response is that the Defendants waived any objection.

There is no waiver, as the Defendants repeatedly raised this issue in the district court, including in their Rule 59(e) motion. Moreover, sovereign

immunity is not so easily waived: it can be raised for the first time on appeal. *Edelman v. Jordan*, 415 U.S. 651, 677–78 (1974). At various stages, the court denied the Defendants' motions to dismiss Collier and the ADA claims against him because injunctive relief could be granted. Once it became clear that only monetary relief would be awarded, the ADA claims should have been dismissed because they were made solely against Collier, in his official capacity, and the ADA does not waive sovereign immunity. *Board of Trs. of Univ. of Ala. v. Garrett*, 531 U.S. 356, 360 (2001).

Accordingly, we hold that the Defendants have "clearly establish[ed] . . . a manifest error of law" and the district court abused its discretion in denying the Defendants' Rule 59(e) motion to alter the judgment on this ground. *In re Life Partners*, 926 F.3d at 128.

As we will discuss later, this conclusion affects our resolution of the dispute over attorney's fees. It also limits the needed analysis of the sufficiency of the evidence to the Rehabilitation Act claims against the TDCJ.[2] Rehabilitation Act and ADA claims are similar, but some Rehabilitation Act claims have a more demanding standard of causation. With those disclaimers, we proceed to the remaining issues.

## II.    *Sufficiency of the evidence on termination and failure to accommodate*

The Defendants argue there was insufficient evidence to uphold the jury's verdict because: (1) Harmon was not a "qualified" individual with a disability, (2) Harmon could not be accommodated reasonably, and (3) Harmon failed to show the Defendants acted with discriminatory or retaliatory animus when terminating her.

---

[2] Unlike the ADA, the Rehabilitation Act waives sovereign immunity. 42 U.S.C. § 2000d-7; *Pace v. Bogalusa City Sch. Bd.*, 403 F.3d 272, 280–89 (5th Cir. 2005) (*en banc*).

To begin, we explain a few background principles of the Rehabilitation Act and the ADA. The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). The Rehabilitation Act expressly incorporates the ADA's employment discrimination standards by cross-reference. § 794(d). Thus, for the most part, cases interpreting either the ADA or the Rehabilitation Act are applicable to both. *Delano-Pyle v. Victoria County*, 302 F.3d 567, 574 (5th Cir. 2002). The main difference relevant here is in causation: whereas the ADA only requires that the individual's disability be a motivating factor, the Rehabilitation Act requires the individual's disability to be the *sole cause* of the adverse employment action. *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 505 (5th Cir. 2002); *Pinkerton v. Spellings*, 529 F.3d 513, 519 (5th Cir. 2008).

We mention here that the Rehabilitation Act's sole-causation requirement only applies in certain contexts. It applies to discrimination claims under Section 794(a), but not to retaliation claims or failure-to-accommodate claims. Retaliation claims are governed by the ADA's standards through Section 794(d)'s cross-reference. *January v. City of Huntsville*, 74 F.4th 646, 652–53 (5th Cir. 2023). Thus, a plaintiff bringing a retaliation claim under the Rehabilitation Act need only show that her protected act was a but-for cause of her termination. *Id.* at 654. For failure-to-accommodate claims, "the cause of that failure is irrelevant." *Bennett-Nelson v. Louisiana Bd. of Regents*, 431 F.3d 448, 454–55 (5th Cir. 2005).

To prevail on Rehabilitation Act discrimination claims under Section 794(a), a plaintiff must show "(1) she is an individual with a disability; (2) who is otherwise qualified; (3) who worked for a program or activity

No. 23-40342

receiving Federal financial assistance; and (4) that she was discriminated against solely by reason of her . . . disability." *Houston v. Tex. Dep't of Agric.*, 17 F.4th 576, 585–86 (5th Cir. 2021) (quotation marks omitted) (quoting *Hileman v. City of Dallas*, 115 F.3d 352, 353 (5th Cir. 1997)). Here, the Defendants challenge the sufficiency of the evidence on the second and fourth elements, while also asserting Harmon was required to show discriminatory or retaliatory animus.

### a. *"Qualified individual"*

A "qualified individual" under the Rehabilitation Act "means an individual who, with or without reasonable accommodation, can perform the essential functions of" her position. 42 U.S.C. § 12111(8); 29 U.S.C. § 794(d).[3] The statute further provides that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." *Id.* The Defendants argue Harmon was not "qualified" to be a correctional officer under the Rehabilitation Act because an essential function of her position required her to be present at work.

We begin with the essential functions of a correctional officer listed in TDCJ's job description. Although Harmon argues that "[n]owhere in the job description is attendance identified as an 'essential function'" of the job, it is certainly implied. Several of the activities described as "[e]ssential

---

[3] The parties agree that the Rehabilitation Act incorporates the ADA's definition of qualified individual. We proceed on that assumption, considering ADA cases as relevant to our analysis. *See J.W. v. Paley*, 81 F.4th 440, 449 (5th Cir. 2023) (highlighting the causation standards as the only material difference between the ADA's and Rehabilitation Act's standards for liability).

[f]unctions" seem impossible without physical presence, including "[s]earch[ing] for contraband," "[p]rovid[ing] custody and security," "[s]upervis[ing] . . . offenders," "[r]espond[ing] to emergencies," and "searching for escaped offenders." On their face, none of these functions can be performed from home, and Harmon provides no argument to the contrary. At trial, Harmon testified she cannot perform these essential functions of her job without being at work. TDCJ's description, however, is not the end of the inquiry.

The parties debate the applicability of one precedent considering another job that seemingly requires physical presence: flight attendants. *See Carmona v. Southwest Airlines Co.*, 604 F.3d 848, 859–61 (5th Cir. 2010). There, Carmona was a male flight attendant who suffered from psoriasis and psoriatic arthritis, which required him to take intermittent leave several times a month. *Id.* at 850–51. Under an agreement with the flight attendants' union, Southwest had an "attendance policy" that employed a point system that would accrue for various types of attendance lapses. *Id.* at 851. Points older than 16 months would be "rolled off" automatically, but a total of 12 points would lead to termination, albeit not before warnings at certain point thresholds and pre-termination processes.[4] *Id.* Carmona was terminated after he exceeded the 12-point limit, though the number of points was disputed. *Id.* at 852–53. He sued Southwest under the ADA and Title VII; a jury found for him on his ADA claim but not on Title VII. *Id.* at 853–54.

On appeal, Southwest argued Carmona presented insufficient evidence to show he was a "qualified individual" because attendance was a "necessary qualification" of his job, and his disability "prevented him from

---

[4] This is essentially the inverse of TDCJ's LWOP policy, which has a 12-month roll over period and counts down the number of days used.

attending his job regularly." *Id.* at 859. The district court disagreed because there was sufficient evidence for "a reasonable jury to conclude that flight attendants' schedules at Southwest were extremely flexible." *Id.* Although this court was "sympathetic" to Southwest's argument, we concluded the evidence at trial was sufficient. *Id.* First, there was "no dispute" Carmona could perform his job when he was present. *Id.* Even assuming attendance was an essential function of the job, he was able to meet Southwest's own standard for seven years before his termination because of the airline's lenient policy. *Id.* at 859–60 & n.3. Even though his supervisors determined he was unqualified because he exceeded the 12-point limit under the letter of Southwest's attendance policy, he presented evidence that similarly situated employees were not terminated and therefore a reasonable jury could determine his attendance "would have been deemed adequate under the unwritten policy that was actually in effect." *Id.* at 860–61.

For the most part, this case is indistinguishable from *Carmona*. Attendance was a seemingly inherent requirement for both correctional officers and flight attendants, but both TDCJ and Southwest granted extensive leave based on accrual and roll-over systems. *Id.* at 851. In both cases, the employees remained within the bounds of the policies for numerous years despite their disabilities. *Id.* at 860. In both cases, there was no issue with the employees' performance when present at work. *Id.* at 859. Although TDCJ's written policy stated LWOP was "not an entitlement and require[d] approval," the jury heard testimony referring to it as all but an entitlement because LWOP was almost never denied. Thus, like in *Carmona*, a reasonable jury could conclude that, even though Harmon disputedly exceeded the 180-day LWOP written policy, her attendance "would have been deemed adequate under the unwritten policy that was actually in effect." *Id.* at 861.

The Defendants argue that, unlike *Carmona*, correctional officers' schedules are not "extremely flexible" because they "work specific eight-hour shifts, six days on and three days off." This argument, however, misses the import of *Carmona*. There, we acknowledged that no evidence suggested flight attendants "may skip the days they have scheduled at will." *Id.* at 859. That made us "sympathetic" to Southwest's argument that the district court erred by relying on evidence demonstrating "flight attendants' schedules at Southwest were extremely flexible." *Id.* Nevertheless, we upheld the jury's verdict because the dispute was about attendance, not scheduling. *Id.* As we explained:

> Even if we assume that attendance was an essential function of Carmona's job, Southwest's own measure of whether or not a flight attendant's attendance was adequate was its attendance policy, which was extremely lenient. Carmona managed to stay within the bounds of this policy for seven years, despite his irregular attendance, and despite his disability. Therefore, we do not think that his disability made him unqualified for his job, even though it often caused him to miss work.

*Id.* at 859–60 (footnote omitted). As described above, the same could be said here.[5]

---

[5] For similar reasons, the case mentioned by the Defendants' counsel at oral argument, but not cited in any brief, does not convince us otherwise. *See Weber v. BNSF Ry. Co.*, 989 F.3d 320 (5th Cir. 2021). In that case, Weber was terminated for five *unexcused* absences after previously being warned that continued unexcused absences could result in his termination. *Id.* at 322. Although the opinion does not state how much *excused* leave was allowed under BNSF Railway's attendance policy, the court explained Weber's employment required "*regular* attendance" and his requests for medical leave were denied. *Id.* at 321–23, 325–26. Based on the record in that case, we explained that "[u]nlike the 'extremely lenient' attendance policy in *Carmona*, BNSF maintains and enforces a strict written attendance policy with progressive disciplinary measures." *Id.* at 326. Here, the facts align with *Carmona*, not *Weber*.

The Defendants also argue *Carmona* is distinguishable because Carmona was able to demonstrate that other employees exceeded the 12-point limit but were not terminated, "leading to an inference of discrimination." Although it is true that similar evidence was not presented here, *Carmona*'s evidence of comparators was not necessary for the determination on his job qualifications. Instead, it was evidence that a reasonable jury could use to find Carmona "would have been deemed adequate under the unwritten policy that was actually in effect." *Id.* at 861. Here, there was other evidence suggesting an "unwritten policy." Moreover, the court discussed the evidence of comparators primarily in determining whether Carmona was discriminated against "because of" his disability. *Id.* at 861–62. That is a separate, albeit related, element of an ADA discrimination claim, which we will address in the next section. *See Kemp v. Holder*, 610 F.3d 231, 235 (5th Cir. 2010) (listing the elements of an ADA claim).

We conclude there was sufficient evidence for a reasonable jury to determine that Harmon was an "otherwise qualified individual" within the meaning of the Rehabilitation Act.

b.    *Discrimination "solely by reason of" a disability and failure to reasonably accommodate*

Although discrimination "solely by reason of" a disability is the fourth element of viable Rehabilitation Act discrimination claims, there is significant overlap with an employer's duty to provide a reasonable accommodation through an interactive process. The ADA's prohibition on discrimination, as incorporated into the Rehabilitation Act by cross-reference, includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual" unless the employer can demonstrate "undue hardship." 42 U.S.C. § 12112(b)(5)(A); 29 U.S.C.

§ 794(d); *see also* 28 C.F.R. § 42.511. When a disability is known and "an employer's unwillingness to engage in a good faith interactive process leads to a failure to reasonably accommodate an employee, the employer violates the ADA." *Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 736 (5th Cir. 1999); *see* 29 C.F.R. §§ 1614.203(d)(3)(i), 1630.2(o)(3). "An employer may not stymie the interactive process of identifying a reasonable accommodation for an employee's disability by preemptively terminating the employee before an accommodation can be considered or recommended." *Cutrera v. Bd. of Supervisors of La. State Univ.*, 429 F.3d 108, 113 (5th Cir. 2005). Because "[t]he substantive standards for employment discrimination under the [ADA] apply equally to claims brought under the Rehabilitation Act," a prior panel applied the interactive process obligation to discrimination claims under the Rehabilitation Act. *Stokes v. Nielsen*, 751 F. App'x 451, 454–55 (5th Cir. 2018). We agree with that approach and do the same.

Here, the Defendants raise two closely related arguments to support that there was insufficient evidence to show discrimination. First, they argue that Harmon's requested accommodation amounts to "extended or indefinite leave" that is not reasonable because it does not allow the employee to work and burdens other employees. Second, the Defendants argue that Harmon never requested a reasonable accommodation in her May 31 doctor's note.

Viewing all inferences in the light favorable to the jury verdict, as we must, these arguments fail. The Defendants' framing of the requested accommodation as one for "extended or indefinite leave" improperly assumes the jury's role as factfinder. To start, it assumes that Harmon exhausted her 180-day LWOP by the time of her May 31 doctor's note. At trial, Reyes admitted she incorrectly calculated that Harmon had 80 days of LWOP remaining in her March PERS 301 notice. The jury heard conflicting testimony on when Harmon's LWOP was exhausted. It also heard Wood,

the Director of Employee Services, testify that "[i]t didn't seem like" Reyes knew what she was doing when she calculated Harmon's LWOP exhaustion date. Given this conflicting testimony, the jury was entitled to credit Harmon's testimony suggesting she was within the 180-day limit on May 31. *See Olibas*, 838 F.3d at 450.

Similarly, the Defendants' framing turns what was presented as an accommodation for one day into an accommodation for indefinite leave. This may be a reasonable assumption given Harmon's past need for leave. The jury heard evidence of this, but it also heard Harmon testify that her actual requested accommodation was for one day beyond the 180-day LWOP limit. The jury was free to determine what the actual accommodation was, and we may not find to the contrary on appeal. *See id.*;*Williams*, 898 F.3d at 614.

The Defendants argue TDCJ provides extremely generous accommodations to disabled employees through its 180-day LWOP policy and the Rehabilitation Act does not require more. They cite out-of-circuit precedent for the proposition that "an employer's decision to voluntarily offer an accommodation that might not otherwise be required under anti-discrimination statutes does not bind the employer to continue offering that accommodation." *See Faidley v. United Parcel Serv. of Am., Inc.*, 889 F.3d 933, 943 (8th Cir. 2018) (*en banc*); *Holbrook v. City of Alpharetta*, 112 F.3d 1522, 1528 (11th Cir. 1997); *Vande Zande v. Wis. Dep't of Admin.*, 44 F.3d 538, 545 (7th Cir. 1995). In those cases, however, the courts were dealing with individualized accommodations the employer already made to the employee and the unique circumstances and qualifications of their employment. *See Faidley*, 889 F.3d at 942–43; *Holbrook*, 112 F.3d at 1528 & n.4; *Vande Zande*, 44 F.3d at 544. Thus, those cases are distinguishable because there was no attempt by TDCJ to engage in an interactive process and consider alternative accommodations before terminating Harmon. Accepting the Defendants' argument would eliminate the employer's duty to undergo an

interactive process to determine a reasonable accommodation on an individualized basis.[6] *See* 29 C.F.R. § 1630.2(o)(3); *Cutrera*, 429 F.3d at 112.

Further, the Defendants' argument that Harmon's requested accommodation is unreasonable because it would require other employees to work longer lacks merit. The Defendants appear to make an undue hardship argument that would preclude extending the LWOP limit by one day. Even if the Defendants' workload-shifting theory were enough,[7] the record contains more than sufficient evidence for a jury to reject this argument. The jury heard Warden Siringi testify that there was a waitlist of employees wanting to work overtime. He further agreed that it was "common" for him to have other officers stay over their shift to fill in for a colleague on leave. Moreover, in its submissions before EEOC, TDCJ indicated that it could have reached "an accommodation [that] would not have been unreasonable, or unduly burdensome," but it did not do so because there was never an interactive process.[8] This undermines the Defendants' claim that granting

_____

[6] This reasoning does not endorse Harmon's view that TDCJ's "'no restriction' policies . . . are *per se* unlawful." The cases Harmon cites focus on the need for an individualized assessment of whether a person is "disabled." *E.g.*, *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 481–82 (5th Cir. 2006). Employers are prohibited from using "class-based grounds in employment-related decisionmaking." *Id.* at 481. Even though TDCJ's "no restriction" policy could lead to disabled individuals receiving a reduced benefit from the LWOP policy because they must use more leave to return to work, such individuals could be accommodated by extending the LWOP period — like Harmon requested. This does not mean that such policies are *per se* unlawful.

[7] The Supreme Court recently stated that, in the Title VII context, "it would not be enough for an employer to conclude that forcing other employees to work overtime would constitute an undue hardship. Consideration of other options, such as voluntary shift swapping, would also be necessary." *Groff v. DeJoy*, 600 U.S. 447, 473 (2023). This case does not require us to determine what effect, if any, *Groff* has on Rehabilitation Act assertions of undue hardship.

[8] TDCJ asserted in this submission that "the interactive process was initiated" when it sent Harmon an ADA packet after her shift was changed from the first to second, but that Harmon never responded. Harmon, however, testified she never received such a

Harmon's requested accommodation would have been unduly burdensome. The jury was free to weigh this evidence. *See Olibas*, 838 F.3d at 450.

Lastly, the Defendants argue Harmon's May 31 doctor's note did not specifically identify Harmon's disability and resulting limitations or suggest a reasonable accommodation. The initial burden to identify a disability and request an accommodation is on the employee. *Taylor v. Principal Fin. Grp., Inc.*, 93 F.3d 155, 165 (5th Cir. 1996). On this issue, however, "context matters." *Mueck v. La Grange Acquisitions, L.P.*, 75 F.4th 469, 486 (5th Cir. 2023). Where prior experience makes a disability known to the employer, requests for an accommodation were previously made in a similar manner, and the employer previously understood the requests, a jury may reasonably conclude that similar subsequent requests constitute proper requests for accommodations. *See EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d 606, 621–22 (5th Cir. 2009).

Here, the jury was shown numerous doctor's notes that Harmon previously submitted to request LWOP without incident. These notes showed essentially the same information as Harmon's May 31 note. The jury heard conflicting testimony from TDCJ's accommodations coordinator, Terry Bailey, as to what these notes would have communicated. According to this testimony, some notes indicating a return date "without restrictions" were requesting an accommodation of leave until the return date; others were not. There was no apparent reason why these notes were treated differently. Thus, a reasonable jury could have discounted Bailey's testimony and concluded that, in keeping with prior practice, Harmon's May 31 note was a

---

packet. EEOC also found no evidence supporting TDCJ's contention that the packet was sent. The jury was permitted to believe Harmon's version of events over TDCJ's.

proper request for an accommodation. *See Chevron Phillips*, 570 F.3d at 621–22. It appears that is what the jury did.

### c.    *Retaliatory or discriminatory animus*

The Defendants argue that because of the absence of evidence of any motive to fire Harmon, there cannot be a jury finding that she was terminated in retaliation or solely because of her disability. They assert the evidence showing Reyes miscalculated Harmon's LWOP status is evidence of a mistake, not retaliation or discrimination. They also contend Harmon was required to present evidence that her discharge resulted from some retaliatory or discriminatory animus and that the seven-month delay between Harmon's EEO complaint and grievances and her firing is too temporally remote to demonstrate causality.

The precedents on which the Defendants rely for the proposition that discriminatory motive or animus is required are not Rehabilitation Act cases. *See Owens v. Circassia Pharm., Inc.*, 33 F.4th 814, 823 (5th Cir. 2022) (Title VII); *Little v. Repub. Refin. Co.*, 924 F.2d 93, 96 (5th Cir. 1991) (age discrimination). They may be relevant to the extent they discuss what is necessary to raise an inference of discrimination to rebut a non-discriminatory reason as pretext.[9] *See Owens*, 33 F.4th at 826. This

---

[9] The Supreme Court explained what is necessary to overcome a non-discriminatory reason for an adverse employment action at the summary judgment stage. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 147–49 (2000). There has been some doubt as to whether *Reeves* applies after a jury verdict because it relies on the *McDonnell Douglas* framework, which is inapplicable for "a case that has been fully tried on the merits." *Kanida v. Gulf Coast Med. Pers., LP*, 363 F.3d 568, 575 (5th Cir. 2004) (quoting *Powell v. Rockwell Int'l Corp.*, 788 F.2d 279, 285 (5th Cir. 1986)). It has also been suggested that *Little*, as a pre-*Reeves* case, used the wrong standard. *Harville v. City of Houston*, 945 F.3d 870, 877 n.26 (5th Cir. 2019). Nevertheless, it is unnecessary for us to resolve this jurisprudential tension to resolve this case.

presupposes that there is only circumstantial evidence of a Rehabilitation Act violation, not direct evidence of it. *Id.*

In her complaint, Harmon alleged two ways TDCJ violated the Rehabilitation Act: retaliation and discrimination. Both can be proven by direct or indirect evidence. *See Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 579, 588–89 (5th Cir. 2020); *Mueck*, 75 F.4th at 488. A failure-to-accommodate claim is a form of discrimination under the ADA and Rehabilitation Act. *Chevron Phillips*, 570 F.3d at 613–14; *Weber v. BNSF Ry. Co.*, 989 F.3d 320, 324 & n.13 (5th Cir. 2021). As discussed above, Harmon's failure-to-accommodate claim is intertwined with her discriminatory termination claim — TDCJ discriminated against her by terminating her before engaging in an interactive process to determine a reasonable accommodation.

The Defendants concede that a failure-to-accommodate claim does not require a showing of an employer's intent. That concession is consistent with this court's precedent that when an employer fails to make reasonable accommodations, "the cause of that failure is irrelevant." *Bennett-Nelson*, 431 F.3d at 454–55. Sixth Circuit precedent provides further persuasive reasoning for why intent is not required for Harmon's discrimination claim. *See EEOC v. Dolgencorp, LLC*, 899 F.3d 428 (6th Cir. 2018). In *Dolgencorp*, the plaintiff was fired from a Dollar General store for drinking orange juice behind the register on account of her diabetes before paying for it. *Id.* at 432. This violated the store's "grazing policy." *Id.* The plaintiff was fired before any discussion of an accommodation. *Id.*

On appeal following a jury trial finding in favor of the plaintiff, the Sixth Circuit affirmed. *Id.* at 437. On the plaintiff's failure-to-accommodate claim, the court held that Dollar General was liable because, in lieu of an interactive process once the plaintiff's disability and request for

accommodation became known, "[t]he store manager categorically denied [the plaintiff's] request, failed to explore any alternatives, and never relayed the matter to a superior." *Id.* at 434. The court also rejected Dollar General's argument that violating the "grazing policy" was a legitimate, nondiscriminatory reason for firing the plaintiff. *Id.* at 435. It held that "a company may not illegitimately deny an employee a reasonable accommodation to a general policy and use that same policy as a neutral basis for firing him." *Id.* Moreover, Dollar General's argument that it relied on "a neutral policy is of no moment when an employee presents *direct* evidence of discrimination. And failing to provide a protected employee a reasonable accommodation constitutes direct evidence of discrimination." *Id.* (citation omitted). For similar reasons, the court held that the plaintiff did not need to show any animus because "the Act speaks in terms of causation, not animus. An employer violates the Act whenever it discharges an employee 'on the basis of disability' (a necessary requirement for liability), not only when it harbors ill will (a sufficient way of establishing liability)." *Id.* at 436 (citation omitted) (quoting 42 U.S.C. § 12112(a)).

This case presents a similar situation as that in *Dolgencorp*. TDCJ fired Harmon after it concluded she exceeded the 180-day LWOP limit. Like the store manager in *Dolgencorp*, Reyes did not inform her supervisors that Harmon submitted the May 31 doctor's note as an accommodation request. Thus, Harmon was fired before she had any opportunity to engage in an interactive process after making an accommodation request, which is itself a Rehabilitation Act violation. *See Cutrera*, 429 F.3d at 113.

Also like *Dolgencorp*, the Defendants argue the LWOP policy was their "reasonable accommodation," they were under no obligation to further accommodate her, and violating the LWOP policy was the nondiscriminatory reason for firing her. In essence, the Defendants are trying to "illegitimately deny an employee a reasonable accommodation to a general policy and use

that same policy as a neutral basis for firing [her]." *Dolgencorp*, 899 F.3d at 435. Because Harmon presented direct evidence of discriminatory discharge, albeit one intertwined with her failure-to-accommodate claim, no evidence of animus or motive was required. *See id.* at 436.

As for Harmon's retaliation claim, the evidence is more circumstantial. The Defendants argue Harmon engaged in two protected activities: (1) filing an EEO complaint and grievances in October 2017; and (2) filing the May 31 doctor's note as a request for accommodation. As to the former, they argue that activity was too temporally remote to show causation (about seven months) from Harmon's firing in May 2018. It is true that a temporal gap of around seven months, without more, is insufficient. *See Feist v. Louisiana, Dep't of Just., Office of the Att'y Gen.*, 730 F.3d 450, 454–55 (5th Cir. 2013). There *is* more here, however. The jury heard testimony that Reyes failed to follow proper procedures in terminating Harmon. In handling her prior grievances and complaint, Bailey, the accommodations coordinator, failed to follow proper procedures in sending Harmon an "ADA packet." The jury heard other evidence suggesting Reyes and Bailey acted improperly regarding Harmon's EEO complaint and her termination. The jury heard conflicting accounts of whether Warden Siringi yelled, "How you going to say that I violated the leave law?" after he learned about Harmon's complaints. Warden Siringi also gave conflicting testimony about his ability to grant LWOP extensions beyond the 180 days and his reliance on HR to calculate LWOP balances. All of this could amount to additional factors that would make a seven-month temporal gap sufficient for a reasonable jury to conclude there was retaliation.[10] *See Schroeder v. Greater New Orleans Fed. Credit Union*, 664 F.3d 1016, 1024–25 (5th Cir. 2011).

_____

[10] Admittedly, this is a close call because there is no evidence that Reyes knew of Harmon's prior complaints, or that Bailey was involved in her ultimate termination. That

This conclusion is supported by considering the submission of the May 31 doctor's note, Harmon's second protected activity.  Reyes called Harmon at 4:36 p.m. the day before her LWOP was exhausted and told her she needed to report to work the next day or she would be terminated.  The following day, Reyes received Harmon's doctor's note requesting an accommodation, but she did not send it to anyone even though she later admitted that Harmon could have been accommodated had she done so.  Under these circumstances, a reasonable jury could conclude that, even if Reyes' initial LWOP calculations were a mistake, she failed to check the accuracy of her assumption in light of evidence suggesting it was incorrect, and that failure would support a retaliation claim.  *See Chevron Phillips*, 570 F.3d at 624–25; *Owens*, 33 F.4th at 829.

Although this circumstantial evidence rests primarily on contradictory statements and evidence from witnesses, it is not our role to "make credibility determinations or weigh the evidence."  *Williams*, 898 F.3d at 614 (quoting *Homoki*, 717 F.3d at 395).  We therefore hold that sufficient evidence exists for a reasonable jury to find in Harmon's favor on her discrimination and retaliation claims.

## III.    *Sufficiency of the evidence on the failure to rehire*

The Defendants next challenge the jury's verdict on Harmon's failure to rehire claim.  Specifically, they argue that Werner, the regional director, did not have final approval over Harmon's rehire application and that Harmon did not show Werner possessed any leverage over the final decisionmaker, Billy Hirsch, that would suggest his recommendation not to

---

said, we cannot conclude "the facts and inferences point so strongly and overwhelmingly in favor of the [Defendants] that reasonable jurors could not have arrived at a contrary verdict." *Williams*, 898 F.3d at 614 (quoting *Homoki*, 717 F.3d at 395).

rehire her was the cause of the denial.  They also argue that there was no evidence Werner knew Harmon "had a disability or had engaged in protected activity."

Harmon's failure-to-rehire claim relies on circumstantial evidence. TDCJ directs us to the "cat's paw" theory of liability that has been applied in Title VII and age discrimination cases.  *See Zamora v. City of Houston*, 798 F.3d 326, 331 (5th Cir. 2015).  Under this analysis, there must be sufficient evidence to show "(1) that a co-worker exhibited discriminatory animus, and (2) that the same co-worker 'possessed leverage, or exerted influence, over the titular decisionmaker.'"  *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 653 (5th Cir. 2004) (quoting *Russell v. McKinney Hosp. Venture*, 235 F.3d 219, 227 (5th Cir. 2000)).  TDCJ argues that the sole-causation requirement for Rehabilitation Act discrimination claims forecloses a cat's paw theory of liability.  We examine this argument.

In a previous case, we held that cat's paw applies to Title VII retaliation claims.  *Zamora*, 798 F.3d at 331–33.  The retaliation claims there required but-for causation, rather than the lower motivating-factor standard traditionally associated with cat's paw liability, but we found no issue squaring cat's paw with but-for causation.  *Id.*  A simple tweak to the traditional cat's paw framework sufficed.  *Id.* at 332.  When the claim only requires discriminatory animus to be a motivating factor, cat's paw liability requires a showing that the co-worker's discriminatory animus was a proximate cause of the adverse employment action.  *Id.*  By contrast, when the claim requires but-for causation, as is true of retaliation claims, cat's paw liability instead requires a showing that the co-worker's animus was a but-for cause of the adverse employment action.  *Id.*

We find that reasoning persuasive here, at least as it concerns retaliation claims under the Rehabilitation Act.  As previously held, these

No. 23-40342

claims require but-for causation. *January*, 74 F.4th at 652–54. In that sense, retaliation claims under the Rehabilitation Act are indistinguishable from the Title VII retaliation claims in *Zamora*. In the absence of any apparent distinction, we hold that cat's paw claims for retaliation may be brought under the Rehabilitation Act. Thus, Harmon's failure-to-rehire retaliation claim requires a showing that Werner's retaliatory animus was a but-for cause of TDCJ's failure to rehire her.

Discrimination claims under the Rehabilitation Act are a different story. These claims require sole causation. 29 U.S.C. § 794(a); *Soledad*, 304 F.3d at 505. If we were to apply cat's paw in this context based on the logic of *Zamora*, a co-worker's discriminatory animus would have to be the sole cause of the adverse employment action. *See Zamora*, 798 F.3d at 332. That standard is impossible to meet using cat's paw reasoning, at least in the context here: the co-worker's discriminatory animus can never be the sole cause of the adverse employment action because the adverse employment action is also necessarily caused by the titular decisionmaker's independent choice to give decisive weight to the co-worker's recommendation. We hold that Harmon's cat's paw theory, as it regards her failure-to-rehire discrimination claim, fails as a matter of law. Given the lack of evidence establishing that Hirsch had discriminatory animus, insufficient evidence supports the jury's verdict on this theory.[11]

We next consider whether sufficient evidence supported the jury's verdict on Harmon's failure-to-rehire retaliation claim. For the reasons we discuss below, sufficient evidence supported the jury's verdict on this claim.

---

[11] We express no opinion on whether a cat's paw theory could work under materially different circumstances.

No. 23-40342

First, a reasonable jury could conclude Werner harbored some retaliatory animus that led him to recommend against Harmon's rehire. On her rehire application, Harmon stated the reason for her prior termination was "exhaustion of leave." An "[a]pplicant [i]nformation" page, which appears to be internal, also lists the reason for termination as "Exhaustion of 180 days LWOP–Medical." Werner admitted this indicated some medical-related issue with her prior employment. In addition, Werner admitted that he knew the complaint and grievance regarding Harmon's shift change arose over her disabilities. Although he testified that he did not remember Harmon was disabled at the time he reviewed her rehire application, a reasonable jury could discredit that testimony when considering this evidence. Moreover, Werner provided no reason for why he recommended against rehiring Harmon. He testified that Harmon had significant experience as a correctional officer, he had no questions as to whether Harmon could perform her job, his decision was unrelated to minor tardies Harmon had from 2010, and he was "surprised" Harmon was not rehired when TCDJ was experiencing a shortage of 8,000 correctional officers at the time. Given all of this, a reasonable jury could infer that Werner's recommendation was based on Harmon's protected activity.

The Defendants argue there is a lack of temporal proximity between Harmon's 2017 EEO complaint, her May 31 request for accommodations, or her July 2018 EEOC charge and Werner's November 2019 recommendation not to rehire her. The Defendants are correct.[12] *See, e.g.*, *Lyons v. Katy Indep.*

_____

[12] Harmon relies on this court's precedent to argue that "participation in EEOC process constituted protected activity." *See Haire v. Bd. of Supervisors of La. State Univ.*, 719 F.3d 356, 367 (5th Cir. 2013). Harmon stretches this precedent too far, however, because in that case an EEOC charge was filed three months before the adverse employment action occurred. *Id.* at 367. The proposition that the protected activity's duration runs through completion of EEOC proceedings would also seemingly contradict the Supreme Court's admonition that, in the Title VII context, the proceeding is "an action

*Sch. Dist.*, 964 F.3d 298, 306 (5th Cir. 2020). Nevertheless, "temporal proximity is just 'one of the elements in the entire calculation.'" *Strong v. Univ. Healthcare Sys., L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007) (quoting *Shirley v. Chrysler First, Inc.*, 970 F.2d 39, 44 (5th Cir. 1992)). Additional evidence, such as a clean employment record or "an employer's departure from typical policies and procedures," may support a finding of retaliation. *Feist*, 730 F.3d at 454–55. A plaintiff may also "present a chronology of events that would allow reasonable jurors to draw an inference of retaliation." *Brady v. Houston Indep. Sch. Dist.*, 113 F.3d 1419, 1424 (5th Cir. 1997). We agree with a panel of this court that held in an unpublished opinion that "temporal proximity between protected activity and an adverse employment action should be viewed in the context of other evidence." *Mooney v. Lafayette Cnty. Sch. Dist.*, 538 F. App'x 447, 454 (5th Cir. 2013). Based on the evidence described above, a reasonable jury could infer that Werner's recommendation was retaliatory. *See Saketkoo v. Adm'rs of Tulane Educ. Fund*, 31 F.4th 990, 1002–03 (5th Cir. 2022).

Second, a reasonable jury could conclude that Werner's recommendation not to rehire Harmon was a but-for cause of Hirsch's ultimate decision. *See Roberson*, 373 F.3d at 653. Vashunna Jefferson, an HR employee, recommended in favor of Harmon's rehire. The only other recommendation came from Werner, which Hirsch ultimately followed. Absent other evidence that Hirsch independently investigated Jefferson's and Werner's recommendations, a jury may reasonably infer Werner's recommendation was a but-for cause of Hirsch's decision. *See Haas v. ADVO Sys., Inc.*, 168 F.3d 732, 733 (5th Cir. 1999); *Long v. Eastfield Coll.*, 88

---

in which the employee takes no part." *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).

F.3d 300, 307 (5th Cir. 1996).  Given our "especially deferential" standard of review, this evidence is sufficient.  *Williams*, 898 F.3d at 614.

*IV.*     *Irreconcilable answers in the jury verdict*

The Defendants next argue that even if sufficient evidence exists to support the jury's verdict, a new trial should be ordered because the jury's verdict is irreconcilable.  They assert the jury's findings are inconsistent because it found that Harmon was terminated and not rehired "solely because of her disability" and "but for" her protected activities.

"We are required under the Seventh Amendment to make a concerted effort to reconcile apparent inconsistencies if at all possible." *Mercer v. Long Mfg. N.C., Inc.*, 665 F.2d 61, 65 (5th Cir. Unit A 1982).  The test for reconciling apparent conflicts in a jury's answers to interrogatories "is whether the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted." *Griffin v. Matherne*, 471 F.2d 911, 915 (5th Cir. 1973).  Our analysis looks to the interrogatory answers as well as the jury instructions.  *Team Contractors, L.L.C. v. Waypoint Nola, L.L.C.*, 976 F.3d 509, 514 (5th Cir. 2020).

Here, the jury was asked a series of yes-or-no questions as to each defendant and their bases for liability.  Separate questions ask whether Harmon proved that she was terminated "solely because of" her disability and "but for" her protected activities related to her disability.  The same questions are asked regarding TDCJ's failure to rehire Harmon.  The jury instructions largely follow what the Defendants proposed based on Fifth Circuit pattern instructions.  The retaliation instructions explain that to satisfy but-for causation the jury "need not find that the only reason for [the Defendants'] decision was . . . Harmon's protected activity."  Instead, the jury had to find that the decision to terminate or not rehire Harmon "would not have occurred in the absence of — but for — her protected activity."

No. 23-40342

The discrimination instructions explain the causation standard is "solely because of" her disability, as to the Rehabilitation Act claims against TDCJ.

The Defendants argue that the adverse employment decisions here cannot be solely because of Harmon's disability *and also* retaliatory. They cite *dictum* from a Third Circuit case stating that "[b]ecause the [Rehabilitation Act]'s causation requirement requires disability to be the sole cause of discrimination, an alternative cause is fatal to a[] [Rehabilitation Act] claim because disability would no longer be the sole cause." *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 236 n.11 (3d Cir. 2013).

Even if the Third Circuit was correct and its holding would apply to this verdict on the two claims, such inconsistency will not matter *if* the verdict was a general verdict as opposed to a special one:

> Any "objections to alleged inconsistencies between a general verdict and answers to verdict questions are waived if a party fails to object when the jury announces the verdict, while the jury is still empaneled. . . . While waiver would not apply had the jury given a special verdict, the verdict in this instance was general."

*Waypoint*, 976 F.3d at 521 (quoting *Montano v. Orange County*, 842 F.3d 865, 881–83 (5th Cir. 2016)).

There was no objection by the Defendants to any inconsistency while the jury was still empaneled. We therefore need to determine whether the jury returned a general verdict.

In *Waypoint*, this court relied on one of the standard treatises on federal practice to explain that when a jury is given only specific factual questions to answer and is not to apply any instructions about the law to those fact-findings, that is a special verdict:

29

No. 23-40342

> A special verdict is returned in lieu of a general verdict and contains factual findings on all of the material issues in the case.
>
> Pursuant to Rule 49(a), the jury returns its special verdict in the form of written answers to separate questions concerning specific factual issues. The trial court then applies the law to those answers and enters judgment accordingly. By removing from the jury the consideration or application of the law (which a general verdict requires through application of the court's instruction), the special verdict avoids those two sources of possible error in the general verdict.

*Id.* at 517 (quoting 9 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 49.02[2](b) (3d ed. 2019).

We have quoted large portions of the instructions given to this jury already. Those excerpts show the jury was fully to resolve each claim and set the amount of money sufficient to compensate Harmon. As in *Waypoint*, the jury here was not given an explicit question to answer of which party "won," but the jury was nevertheless asked to apply the law as stated in the jury instructions to the facts as it found them. *See id.* at 517–18, 520. "The jury left nothing for the district judge to do . . . other than resolving any arguments as to defects in the verdict, and finding none, to enter judgment." *Id.* at 519. Under our caselaw, that made the *Waypoint* verdict a general one. *Id.* at 520. The same is true here: the jury returned a general verdict.[13]

---

[13] In *Waypoint*, this court acknowledged the holding in *Mercer* might conflict with its rule for identifying general verdicts. *Waypoint*, 976 F.3d at 518–19. To the extent *Mercer* was in conflict, this court limited its applicability to "those situations in which a verdict against one party on different claims is expressed in the manner used at the trial in that case, *i.e.*, in a form similar to multiple general verdicts." *Id.* at 519. *Mercer*, though, was never in conflict with the *Waypoint* rule. In *Mercer*, after the jury returned its verdict, the district court still had law left to apply — namely, the "treble damages provisions of the [Texas Deceptive Trade Practices-Consumer Protection Act]." *Mercer*, 665 F.2d at 65. Because the jury in *Mercer* did not leave "nothing for the district court to do . . . other than

No. 23-40342

We assume for the sake of argument that this issue might still be subject to plain error review. *See* 9B Wright & Miller's Federal Practice and Procedure § 2513. Plain error has "four steps": (1) the district court committed an error that (2) is "clear or obvious" and (3) "affected the appellant's substantial rights" (*i.e.*, it "affected the outcome of the district court proceedings"); if the first three steps are satisfied, (4) the court of appeals may exercise its discretion to correct the error, which is appropriate "only if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" *Puckett v. United States*, 556 U.S. 129, 135 (2009) (quoting *United States v. Olano*, 507 U.S. 725, 734, 736 (1993)). The Defendants fail to satisfy the requirements of plain error for at least two independent reasons.[14]

First, it is not clear or obvious that Rule 49(b) prohibits the entry of judgment under these circumstances. *See* Fed. R. Civ. P. 49(b). Here, we have an alleged irreconcilability between answers to the written interrogatories but not between any of those answers and the general verdict, *i.e.*, judgment for Harmon. Put another way, the Defendants' argument is that Harmon won in two ways when it is only logically possible for her to have won in one way. Rule 49(b) does not clearly speak to this situation: it tells us what to do when (a) "the general verdict and the answers are consistent"; (b) "the answers are consistent with each other but one or more is

---

resolving any arguments as to defects in the verdict, and finding none, to enter judgment," the verdict in *Mercer* was a special verdict under the *Waypoint* rule. *Waypoint*, 976 F.3d at 519. In that key respect, the verdict here is not like the verdict in *Mercer*. Therefore, even if the verdict in this case otherwise bears the features of the verdict in *Mercer* that this court distinguished in *Waypoint* — *i.e.*, multiple claims against a single defendant — the verdict here is still a general one based on our discussion above.

[14] Because the Defendants failed to address the steps of plain error review on appeal, we could find it forfeited. *See United States v. Quintanilla*, 114 F.4th 453, 465–66 (5th Cir. 2024). We entertain the possibility of plain error anyway.

inconsistent with the general verdict"; or (c) "the answers are inconsistent with each other and one or more is also inconsistent with the general verdict." FED. R. CIV. P. 49(b)(2)–(4). It seems reasonably likely that the situation here is to be handled like the first situation. After all, the rule focuses only on whether the answers are consistent with the general verdict, not on whether the answers are consistent with each other. *See* FED. R. CIV. P. 49(b)(2). If so, then the district court was required to enter judgment for Harmon. *Id.* Because nothing indicates that this reading of Rule 49(b) is clearly or obviously wrong, the Defendants cannot show plain error. *See Puckett*, 556 U.S. at 135.

Second, even if the Defendants could satisfy the first three steps of plain error review, we would still decline to exercise our discretion to correct the error. Again, the Defendants' argument is essentially that it is unfair for Harmon to have won in two ways when it is only logically possible for her to have won in one way. On the contrary, it would be unfair to force Harmon to endure a new trial and risk a loss because she was too successful in the first trial. We have no reason to believe that, had the jury been informed of the supposedly irreconcilable answers, it would have found for the Defendants instead of Harmon. Concerns of fairness and judicial economy counsel against ordering a new trial. *See id.*

## V.     *The monetary award*

Except for Section I above concerning the monetary judgement against Collier, the issues we have addressed have been mostly evidentiary and related to witness credibility, entitling the jury to our "especially deferential" standard of review. *Apache Deepwater*, 930 F.3d at 652–53. The Defendants' challenges to the monetary award, however, turn more on law than facts, and our standard of review on questions of law is *de novo*. *Id.* at 653. The Defendants' arguments are two-fold, and we assess each.

### a.     The jury's $1 million damages award

The Defendants argue that there is no evidence indicating Harmon would have received $1 million in "[w]ages and benefits from May 31, 2018 to April 7, 2022," which is what the jury was asked to determine. This amount, they argue, is based on retirement benefits and annuity Harmon would have received if she remained at TDCJ until she retired in 2029, but that is outside the scope of what the jury was tasked with deciding. Instead, they assert the only amount of backpay supported by the record is $227,000, and the remaining amount should have been considered front pay as a matter of law.

On damages, the jury was asked to provide two amounts that together "would fairly and reasonably compensate" Harmon. The first was for "[p]ast mental anguish, anxiety and emotional distress." The second was for "[w]ages and benefits from May 31, 2018 to April 7, 2022." The jury instructions explain this second amount should include "back pay and benefits . . . Harmon would have earned in her employment with" TDCJ had she not been terminated or had she been rehired. The instructions further explain that backpay "include[s] wages or salary and such benefits as life and health insurance, stock options, and contributions to retirement." That said, the jury instructions and interrogatories clearly limit the backpay period to "May 31, 2018 to April 7, 2022." Thus, we must assess whether sufficient evidence was introduced to support the jury's $1 million award *as backpay* and whether any amount should have been considered front pay as a matter of law.

The record reveals that Harmon was the only witness to testify on damages. She was asked about damages on direct, cross, and re-cross examination. On direct examination, Harmon testified that her base salary was "around $3,880 each month." As support, counsel introduced

No. 23-40342

Plaintiff's Exhibit 40, which is a spreadsheet prepared by TDCJ calculating Harmon's salary and benefits from June 2018 to August 2021. The spreadsheet includes Harmon's salary, hazard pay, payroll retirement contributions, "State ERS match," "State LECOS Match," and health benefits. Because the chart stops at August 2021, Harmon testified that the total would be approximately $227,000 if it were extended until April 2022 (up from the $197,000 total shown in the document). When asked by counsel, "Is that all you've lost?" Harmon responded that she also lost her retirement, *i.e.*, her "ERS contribution."

Counsel then introduced Plaintiff's Exhibit 2, which is Harmon's Employee Retirement System ("ERS") statement from June 30, 2016.[15] This document showed that the projected lifetime annuity value of Harmon's pension was $861,965.47, provided Harmon work at TDCJ until 2029.[16] Harmon testified that she "lost all of that" on "[t]he day they terminated me." Counsel then asked her about the "other part of your retirement," which was a "savings account that you were actually putting money into." That amount can be seen in the ERS statement, which shows $17,625.47 as of June 30, 2016. Harmon testified that she had to draw from the account after she was terminated and that it contained about $24,000 in 2018.

On cross examination the following day, TDCJ's counsel asked about Harmon's retirement benefits. Harmon testified that she intended to work until June 30, 2038. Counsel then asked about the $861,965.47 in the ERS statement, and Harmon testified that the annuity was "closed off because I

_____

[15] A more recent version was not available from the ERS of Texas, which is a separate state entity unconnected to TDCJ.

[16] The document shows how this figure would increase based on retirement dates in 2030 and 2031.

was no longer an employee." Harmon conceded that the benefit was conditioned on her remaining a state employee until 2029 and was not located in an account somewhere. She further admitted that TDCJ would never have paid this money because the ERS of Texas is a separate entity and that the $24,000 she testified to earlier was "for the contribution part," "[b]ut the annuity is different."

On re-cross, Harmon confirmed (for the first time, it seems) that she was not seeking reinstatement to her position with TDCJ. Then, Harmon and TDCJ's counsel had the following revelatory exchange:

Q. Okay. Are you asking for money damages?

A. Yes, I am.

Q. Okay. How much?

A. In lieu of —

Q. How much?

A. *For back pay, for front pay.* For — I lost my retirement, my benefits.

Q. Do you have a number?

A. *I am seeking 1.8 million and my attorney fees.* That's *with my retirement* and everything. [Emphasis added.]

Although we do not know what the jury considered in awarding $1 million in backpay, the record indicates the jury was presented with two amounts: $227,000 in salary and benefits derived from Plaintiff's Exhibit 40 and Harmon's testimony, and $861,965.47 derived from Plaintiff's Exhibit 2 (the ERS statement). Harmon further testified that she had approximately $24,000 in what she characterized as a retirement savings account. This was "for the contribution part" of her retirement plan, "[b]ut the annuity is different." Thus, we may conclude that at least some portion of the

$861,965.47 in the ERS statement presented to the jury is Harmon's pension benefits and annuity interest that she admitted she would not be entitled to receive until her retirement date, which would have been in 2029 at the earliest. As a result, at least some portion of this $861,965.47 is for benefits that would have been received only *after* the backpay period in the jury instructions.

Harmon argues we should uphold the jury's $1 million award because it is the amount the jury determined would "fairly compensate" her and the jury was instructed that benefits, including retirement benefits, could be included as backpay. Moreover, at oral argument, counsel asserted that Harmon testified $1.8 million would fully compensate her and the jury could have taken that number and subtracted approximately $800,000 in pension benefits evidenced in the ERS statement. The record, however, belies this assertion.

First, Harmon testified that the $1.8 million she wanted was "[f]or backpay [and] for front pay," and "[t]hat's with my retirement." Regardless of whether this characterization was correct as a legal matter, the jury heard that at least some of this amount was sought as front pay, not just backpay. Second, the jury *did* award $1.8 million as Harmon requested. The jury awarded $1 million for "[w]ages and benefits from May 31, 2018 to April 7, 2022," *as well as* $800,000 for "[p]ast mental anguish, anxiety and emotional distress." Thus, $800,000 was *not* part of the jury's award for wages and benefits (whether considered back or front pay). Instead, it was for non-economic damages. The $800,000 was excluded from the final award because the Defendants belatedly noted to the district court that emotional distress damages are unavailable under the Rehabilitation Act pursuant to Fifth Circuit and Supreme Court caselaw. *See Cummings*, 596 U.S. at 230. The reduction from what Harmon said she wanted to what was awarded in

final judgment therefore had nothing to do with the $861,965.47 figure included in the ERS statement.

This conclusion is further supported by Harmon's post-verdict motion for front pay. Therein, Harmon sought an *additional* award of over $1.8 million as front pay, on top of what the jury already awarded. This amount included $977,536.95 in "[l]ost salary and benefits," which was based on extending Harmon's salary and benefits from Plaintiff's Exhibit 40 from April 2022 to June 2038 but without adjusting for inflation or seniority. The rest of the requested $1.8 million was $861,965.47 in "[l]ost pension and retirement." As support for this amount, Harmon's motion included Plaintiff's Exhibit 2, the ERS statement presented and admitted at trial. When asked if including the $861,965.47 as front pay would constitute double dipping, Harmon's counsel admitted, "We put this in here in case you bought Defendant's argument that hey, you should take this out of her back pay. If you take that money out of back pay, Your Honor, we are asking you to stick it in the front pay." Thus, Harmon's counsel effectively conceded that the jury award included the $861,965.47 figure. Satisfied this is likely the case, we must determine whether the jury could have properly awarded this amount.

This circuit has not adopted "an inflexible rule on the treatment of 'pension benefits' as damages or front pay" because "[t]he term is ambiguous." *Miller v. Raytheon Co.*, 716 F.3d 138, 147 n.3 (5th Cir. 2013). Nevertheless, we have held that benefits dependent on an employee's staying with an employer require "a forward-looking determination from the point of his termination and thus a judgment call like the equitable decision to award front pay." *Id.* at 146. This is in contrast to, for example, money paid *toward* an employee's pension by the employer. *See Banks v. Travelers Co.*, 180 F.3d 358, 365 (2d Cir. 1999). "Absent such proof" that the jury discounted Harmon's pension benefits to their present value in order to

calculate her actual loss, however, the "benefits should have been treated as front pay." *Miller*, 716 F.3d at 146–47. Harmon presented no such proof.

Front pay is an equitable remedy,[17] and the district court must determine whether front pay is appropriate before submitting the issue to the jury. *Hansard v. Pepsi-Cola Metro. Bottling Co.*, 865 F.2d 1461, 1470 (5th Cir. 1989). That process was not followed here. Instead, Harmon initially sought reinstatement under her ADA claims against Collier. At some point that changed, and Harmon sought front pay in lieu of reinstatement. Thus, the district court denied Harmon's motion for front pay because Harmon "did not plead a request for front pay under the Rehabilitation Act in her Complaint."[18] Nonetheless, it was an abuse of discretion to enter a monetary judgment for the full $1 million in backpay because, as explained above, at least some of the $861,965.47 could only be awarded as front pay. *See Bourdais v. New Orleans City*, 485 F.3d 294, 300–01 (5th Cir. 2007).

The Defendants ask us to reduce the award to $227,000 as that is the uncontested amount of Harmon's backpay. We find that we are not in a position to do so, however. The parties have not briefed how Texas ERS benefits work or whether Harmon would lose any ERS or related benefits due to her termination. The district court also did not address this, even though it considered the issue before denying the motion for front pay. Therefore,

---

[17] We have previously recognized that front pay is available under the ADA. *EEOC v. E.I. Du Pont de Nemours & Co.*, 480 F.3d 724, 731–32 (5th Cir. 2007). Although it seems that this court has not decided whether front pay is available under the Rehabilitation Act, it appears to be. *See* 29 U.S.C. § 794a(a)(2); 42 U.S.C. § 2000e-5(e)(3), (g)(1). The Defendants do not argue to the contrary, so we will assume that front pay is available but leave the issue open for another panel to decide.

[18] Even assuming this was error, we would lack jurisdiction to correct it because Harmon did not cross-appeal. *See Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 250 (5th Cir. 2010).

on remand, the district court should assess the appropriate amount of ERS benefits that may be included as backpay, if any, and remit the jury's $1 million accordingly. *See Brunnemann v. Terra Int'l, Inc.*, 975 F.2d 175, 177–78 (5th Cir. 1992). If the district court remits the backpay award, Harmon may accept the remittitur or opt for a new trial solely on the issue of damages. *Id.* at 178.

### b.     *Attorney's fees*

The Defendants' last argument is that if we reverse the judgment against Collier or alter the judgment in any way, we should also reverse the award of attorney's fees. Harmon argues that, even if the court reverses the monetary judgment against Collier, Harmon is still the "prevailing party" entitled to attorney's fees because "Harmon sought money damages and to clear her good name."

Attorney's fees may be awarded to the "prevailing party" under the Rehabilitation Act and ADA. 29 U.S.C. § 794a(b); 42 U.S.C. § 12205. To be considered a "prevailing party," "(1) the plaintiff must achieve judicially-sanctioned relief, (2) the relief must materially alter the legal relationship between the parties, and (3) the relief must modify the defendant's behavior in a way that directly benefits the plaintiff at the time the relief is entered." *Davis v. Abbott*, 781 F.3d 207, 214 (5th Cir. 2015) (quoting *Petteway v. Henry*, 738 F.3d 132, 137 (5th Cir. 2013)). In light of our ruling that Collier and the ADA claims should be dismissed, Harmon is not the "prevailing party" with respect to Collier because there is no remaining "judicially-sanctioned relief" on the claims against him. *See Miraglia v. Bd. of Supervisors of La. State Museum*, 901 F.3d 565, 576–77 (5th Cir. 2018). Harmon's "*subjective* motivation in pursuing civil rights litigation is not the relevant consideration." *Shelton v. Louisiana*, 919 F.3d 325, 329 (5th Cir. 2019). We

therefore must reverse the district court's grant of attorney's fees against Collier.

That still leaves the issue of attorney's fees for the surviving Rehabilitation Act claims against TDCJ. When calculating attorney's fees, "the most critical factor is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). Because ADA and Rehabilitation Act claims are highly interrelated, dismissal of the ADA claims may not require a reduction in attorney's fees. *Id.* at 435. On the other hand, a reduction of the jury's damages award and dismissal of the ADA claims may make the current attorney's fees award excessive. *Id.* at 436. That said, the "district court's superior understanding of the litigation" leaves it in the best position to determine whether the attorney's fees should be reduced in light of our decision today. *Id.* at 437. Accordingly, we leave this issue to the district court's sound discretion on remand.

* * *

Due to Judge Ho's concurrence in the judgment except for concluding that the verdict is irreconcilable, and Judge Dennis's concluding that the verdict is not irreconcilable, this opinion expresses the holding of a majority of the panel on all issues.

AFFIRMED in part; REVERSED in part; VACATED and REMANDED.

No. 23-40342

James L. Dennis, *Circuit Judge*, concurring in the judgment in part and dissenting in part:

I respectfully dissent from the holding that Kimberly Harmon's Rehabilitation Act discrimination claim, based on failure to rehire, fails as a matter of law. In all other respects, I concur in the judgment.

\* \* \*

The principal opinion adopts TDCJ's argument that cat's-paw liability cannot satisfy the Rehabilitation Act's sole causation requirement. The opinion reasons that whenever a biased subordinate influences but does not directly make the adverse decision, the presence of a neutral decisionmaker necessarily breaks the chain of causation. *Ante*, at 25.

But TDCJ did not present this argument in the district court, in its opening brief, or even in reply. It surfaced only in a post-argument letter. That is waiver twice over. *State Indus. Prods. Corp. v. Beta Tech. Inc.*, 575 F.3d 450, 456 (5th Cir. 2009) ("[A]rguments not raised before the district court are waived and will not be considered on appeal unless the party can demonstrate 'extraordinary circumstances.'" (citations omitted)); *Lockett v. EPA*, 319 F.3d 678, 684 n.16 (5th Cir. 2003) (holding that issues not raised in the opening brief are deemed waived). I am reluctant to create a *res nova* holding based on a waived theory never subjected to adversarial testing—particularly on a record shaped by a jury's verdict. *Bridges v. Groendyke Transp., Inc.*, 553 F.2d 877, 880 (5th Cir. 1977) ("It is . . . only on a very rare occasion that a jury verdict, approved by a trial judge, should be overturned.").

Waiver notwithstanding, it appears that neither the statutory text nor caselaw supports the principal opinion's conclusion that cat's-paw liability is incompatible with the Act's "solely by reason of" causation standard. *Ante*, at 25. To be sure, the Rehabilitation Act sets a demanding causation standard

No. 23-40342

for discrimination claims. 29 U.S.C. § 794(a). Unlike statutes that permit liability where a protected trait is either a motivating or but-for factor, the Act imposes liability only when a person is subject to discrimination "solely by reason of" her disability. *Id.* Even so, the standard does not appear to foreclose liability where the discriminatory motive originates in one actor and flows through another, provided that the disability remains the sole force driving the decision.

Whether viewed through the lens of causation or agency law, that is precisely what cat's-paw liability permits courts and juries to assess. The Supreme Court in *Staub v. Proctor Hospital*, 562 U.S. 411 (2011), held that an employer may be liable for employment discrimination where a biased supervisor causes an adverse employment action by influencing an otherwise unbiased decisionmaker. *Staub* did not turn on the causation standard being lenient. And nothing in *Staub* or our own precedents suggests that cat's-paw liability is legally insufficient under a sole-cause standard so long as the bias is the only force at work.

Out of circuit authority illustrates the point. In *Teahan v. Metro–North Commuter Railroad*, the Second Circuit reversed summary judgment for the employer where the plaintiff's termination was ostensibly for absenteeism, but the absenteeism stemmed from alcoholism. 951 F.2d 511, 517 (2d Cir. 1991), *cert. denied*, 506 U.S. 815 (1992).[1] The court rejected the employer's attempt to isolate a downstream justification from the upstream discriminatory cause. The lesson of *Teahan* is that "solely by reason of" does not exclude claims in which the protected trait operates through an intermediate step.

_____

[1] *Teahan* involved a disability discrimination claim brought under § 504 of the Rehabilitation Act. Both § 504 and § 794(a) impose a sole causation requirement.

No. 23-40342

It seems to me that reasoning applies here. "Sole cause" means the disability must be the only reason for the adverse action; it does not require that the final decisionmaker harbor any bias. Harmon presented evidence at trial that her supervisor, John Werner, acted with discriminatory animus based on her disability, and that his recommendation was the determining factor in the decision not to rehire her. Although the final decisionmaker, Billy Hirsch, may not have acted with animus himself, the adverse action traces entirely to Werner's discriminatory motive as Hirsch merely rubberstamped his recommendation. Just as absenteeism in *Teahan* was a downstream effect of alcoholism, Hirsch's decision here is a downstream effect of Werner's animus, which remained the sole operative cause of the adverse action.

Any contrary rule could, in my view, invite evasion of the Rehabilitation Act's protections. An employer may escape liability simply by inserting a neutral intermediary between a biased supervisor and the final decision. That is exactly the sort of delegation-by-design that *Staub* and our Title VII precedent in *Zamora v. City of Houston*, 798 F.3d 326, 332 (5th Cir. 2015), recognized as a threat to meaningful enforcement.

Accordingly, I concur in the judgment in part and respectfully dissent in part.[2] Because the principal opinion's reasoning fails to command a majority, it has no precedential force.

_____

[2] On Harmon's pension, I agree to vacate and remand. I note that the district court denied Harmon's motion for front pay solely because she had not pleaded front pay. That was manifestly erroneous. *Reneau v. Wayne Griffin & Sons, Inc.*, 945 F.2d 869, 870 (5th Cir. 1991); *McMillian v. Aberdeen Sch. Dist.*, No. 24-60419, 2025 WL 2058764, at *3 (5th Cir. July 23, 2025).

No. 23-40342

JAMES C. HO, *Circuit Judge*, concurring in the judgment in part and dissenting in part:

Discrimination and retaliation are distinct theories of liability. An employer is liable for discrimination if it takes an adverse employment action based on a protected characteristic, such as disability. An employer is liable for retaliation if it takes an adverse employment action based on a protected activity, such as filing a grievance or complaint alleging discrimination.

Employees can often prevail on discrimination and retaliation claims at the same time. But this is an unusual case, because it arises under the Rehabilitation Act. That Act is unique because it imposes a different causation standard than other federal anti-discrimination statutes.

To succeed on her discrimination claim under the Rehabilitation Act, Kimberly Harmon had to prove that her employer took adverse action against her "solely" because of her disability. 29 U.S.C. § 794(a). *Contrast* 42 U.S.C. § 12112(a) (prohibiting discrimination "on the basis of" disability); 29 U.S.C. § 623(a)(1)–(2) (prohibiting discrimination "because of" age); 42 U.S.C. § 2000e-2(a)(1)–(2), (m) (prohibiting discrimination "because of" race, color, religion, sex, or national origin, and requiring the employee to show that discrimination was a "motivating factor" for the adverse action).

Meanwhile, to succeed on her retaliation claim, Harmon had to prove that her employer wouldn't have taken adverse action against her "but for" her engagement in protected activities. *See, e.g., January v. City of Huntsville*, 74 F.4th 646, 652–54 (5th Cir. 2023) (explaining that the Rehabilitation Act incorporates the "but for" causation standard for retaliation claims under the Americans with Disabilities Act).

So uniquely under the Rehabilitation Act, discrimination and retaliation are mutually exclusive theories. Retaliation cannot possibly be a "but for" cause of an adverse employment action, if that same action is

No. 23-40342

"solely" caused by disability discrimination. Our colleagues on the Third Circuit have held as much. *See*, *e.g.*, *CG v. Pa. Dep't of Educ.*, 734 F.3d 229, 236 n.11 (3rd Cir. 2013) (explaining that "the Rehabilitation Act's causation requirement requires disability to be the sole cause of discrimination," so "an alternative cause is fatal to a Rehabilitation Act [discrimination] claim because disability would no longer be the sole cause") (citing *Menkowitz v. Pottstown Mem'l Med. Ctr.*, 154 F.3d 113, 125 (3rd Cir. 1998)).

And that's the problem with the jury verdict here. The jury found Harmon's employer liable under both discrimination and retaliation under the Rehabilitation Act. The verdict form states that her employer terminated and failed to rehire Harmon "solely" because of her disability. But the jury also found that retaliation was the "but for" cause of those adverse employment actions.

Discrimination cannot be the "sole" cause if retaliation was also the "but for" cause. So the jury verdict is irreconcilably in conflict. We should vacate the judgment below and grant a new trial. *See*, *e.g.*, *Lindsley v. Omni Hotels Mgmt. Corp.*, 123 F.4th 433, 443 (5th Cir. 2024) (vacating judgment and remanding for new trial due to inconsistency in the jury verdict).[1]

Accordingly, I concur in the judgment in part and dissent in part.

---

[1] The majority tries to evade the issue by suggesting that any objection along these lines wasn't preserved at trial. *See ante*, at 29–32. After all, the majority notes, when a jury issues a general verdict, then any suggestion of inconsistency in the verdict must be raised during trial. But the jury in this case didn't issue a general verdict. When a jury returns "multiple verdicts to resolve one defendant's liability under different claims" (as it did here), that's a special verdict, not a general verdict. *Team Contractors, L.L.C. v. Waypoint NOLA, L.L.C.*, 976 F.3d 509, 519 (5th Cir. 2020). *See also Mercer v. Long Mfg. N. C., Inc.*, 665 F.2d 61, 65 (5th Cir. 1982) (holding that a jury verdict on three separate liability theories was special rather than general). Our court has made clear that "waiver would not apply had the jury given a special verdict." *Waypoint*, 976 F.3d at 521.